**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **WILLIE TERION WASHINGTON,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| | § | |
| **-VS-** | § | **Civil Action No.:  H-07-721** |
| | § | |
| | § | |
| **NATHANIEL QUARTERMAN,** | § | |
| **Director, Texas Department of** | § | |
| **Criminal Justice, Institutional Division,** | § | |
| | § | |
| **Respondent.** | § | |

**PETITIONER'S REPLY TO RESPONDENT QUARTERMAN'S ANSWER
TO THIRD AMENDED PETITION AND MOTION FOR SUMMARY JUDGMENT**

The Petitioner, Willie Terion Washington, through counsel, respectfully submits this

Reply to Respondent's Answer to his Third Amended Petition for writ of Habeas Corpus.[1]

**Introduction.**

As set forth in his Petition, Mr. Washington was convicted and sentenced to death in

violation of his fair trial rights under the laws and Constitutions of the United States and Texas.

In particular:

---

[1]  The following shorthand will be utilized throughout this Reply: Respondent
Quarterman's Answer to Petitioner's Third Amended Petition and Motion for Summary
Judgment With Brief in Support will be referred to as "Answer ___," followed by the
corresponding page in Respondent Quarterman's Answer; Mr. Washington's Third Amended
Petition for Writ of Habeas Corpus will be referred to as "Petition ___"; the trial transcript will
be denoted by the volume number followed by "RR" and the corresponding page number in the
trial record, e.g., "8 RR 975."

\*        his capital trial was handled by a patently unqualified and unprepared lawyer retained pursuant to an unethical fee arrangement contingent on the settlement of a prior Workman's Compensation claim;

\*        every major aspect of Mr. Washington's representation was botched and bungled – from pretrial practice through jury selection and throughout both phases of trial;

\*        the prosecutor, notorious for his practice of racially discriminatory jury selection, used his challenges to remove qualified African American and Latino jurors, deliberately causing the empaneling of an all-white jury;

\*        due to counsel's complete failure to investigate the case and prepare for trial, the State was able to depict the tragic incident at issue as an intentional murder committed during a robbery, which is not what in fact occurred;

\*        the State withheld the criminal records of key punishment phase witnesses and knowingly allowed its witnesses to testify falsely;

\*        trial counsel made major admissions of attorney ineffectiveness in an initial affidavit but substantially redrafted it at the behest of the trial judge and with the active involvement of an assistant district attorney, all done *ex parte* and without notice to Mr. Washington or his habeas counsel; based on these improper *ex parte* contacts with the State and trial counsel, the trial judge recused herself from state habeas proceedings;

\*        the replacement state habeas judge allowed the State to submit its proposed findings of fact in open court, without proper service or filing, at a hearing nearly 2 ½ years after the findings were due.  The findings were instantly signed by the court and entered as the operative findings of fact herein.

Mr. Washington's one-sided trial was not the "adversarial testing process" required by the Sixth and Fourteenth Amendments.  Consequently, even the most basic case facts were distorted and misrepresented, such as the nature and extent of the illicit drug operation taking place at the store where the shootings occurred, Mr. Washington's prior relationship with the victims, confusion about the weapons at the store, how the incident began, and whether or not there was even the requisite underlying robbery.

2

In its Answer, Respondent interposes a litany of procedural objections and other unavailing reasons for this Court to allow Mr. Washington's conviction and death sentence to stand despite the readily provable unlawfulness whereby they were achieved.

This Reply does not address every argument made by Respondent in its Answer nor respond to Respondent's position as to every claim presented in the Petition.  Rather, this Reply will address only certain of Respondent's arguments and Mr. Washington's habeas claims.  The omission of any response or the absence of a reference to any claim is not a waiver or abdication of any claim in Mr. Washington's Petition, all claims of which are fully incorporated herein by specific reference.  The claims will be addressed in this Reply by reference to their claim numbers as presented in the Petition.

A.    **INEFFECTIVE ASSISTANCE OF COUNSEL**

3.    <u>**Conflict of interest claim.**</u>

(a)    **The Claim is Fully Exhausted.**

Respondent incorrectly asserts that Mr. Washington's "allegation that a conflict arose because the fee arrangement [with counsel] was unethical was not presented to state court." Answer at 19.  Respondent continues, "Washington asserts his claim that counsel was conflicted as a result of entering into an unethical fee arrangement for the first time in federal court.  In denying the state court a fair opportunity to review this claim, he fails to meet the exhaustion requirement." Answer at 22.

Contrary to the State' assertions, this claim was raised in Mr. Washington's original state Petition for Writ of Habeas Corpus (hereinafter, "state habeas petition"), filed in the 180th Judicial District Court of Harris County, Texas, on April 11, 1990.  At page 18 of that petition,

3

Mr. Washington specifically invoked State Bar of Texas Rules DR-101(A) and EC5-3 (a lawyer should not acquire property rights that would adversely affect his professional judgment and representation of a client) and DR5-103 and EC5-7 (an improper acquisition of a proprietary interest in a cause of action that does not fall within the contingent fee exception of DR-103.)

Even a cursory review of Mr. Washington's state habeas petition would reveal that it contains all of the allegations and arguments set forth in his federal habeas petition concerning the conflict of interest.  Specifically, he alleged in his state habeas petition:

- Trial counsel Reo Harris accepted the representation of Mr. Washington in this capital murder trial in exchange for the assignment of a worker's compensation settlement.  Petition for a Writ of Habeas Corpus, *Ex Parte Washington*, No. 449603 (180th Dist. Ct. Harris Co.) at 18 (hereinafter "State Habeas Petition").

- The assignment of a worker's compensation settlement is barred by statute as well as state bar disciplinary rules. *Id*.

- Mr. Harris acceptance of the representation prevented competent counsel from being appointed by the court at state expense. *Id*. at 22.

- The fee accepted by Mr. Harris "was and is (in every conceivable situation) inadequate to defend a capital murder case in which the defendant pleads 'not guilty'.  Mr. Harris should have known this." *Id*. at 22.

- Counsel's acceptance of the illegal and unethical fee arrangement resulted in a conflict of interest because he would "keep the full amount of the settlement himself . . . *or* use part of the settlement proceeds to hire private investigators, *as requested by Mr. Washington*." *Id*. at 19.

- Counsel's conflict of interest resulted in counsel's failure to present a defense, as exemplified in the ineffective assistance of counsel claims raised in the application.  *Id*. at 22.

Mr. Washington's state habeas petition cites both the standard in *Cuyler v. Sullivan*, 446 U.S.

4

335 (1980), discussing conflicts of interest, as well as the ineffective assistance of counsel

standard in *Strickland v. Washington*, 466 U.S. 668 (1984).  State Habeas Petition, at 16.  This is

precisely the claim raised in Mr. Washington's federal habeas petition.  The only significant

changes in the federal claims pled by Mr. Washington are clarifications of the facts regarding

financial arrangements which were obtained through the deposition of trial counsel Reo Harris,

as well as the inevitable legal briefing which would be developed over the course of the more

than eleven years between the filing of Mr. Washington's state habeas petition and his current

petition for a writ of habeas corpus before this Court. The Respondent's position that the claim is

unexhausted is a misstatement of the record.

The new facts presented by Mr. Harris' deposition testimony, if believed, do very little to

alter the foundation of the claim.  Mr. Harris claims that he received money from Mr.

Washington's brother before he was murdered prior to the trial.  *See* Second Amended Petition,

at 66.  Mr. Harris also claims in his deposition, in contrast to his sworn statement to the contrary

in his earlier affidavit, that he hired an investigator.  *Id*. at 67. Facts not presented to the state

courts can be submitted in federal habeas proceedings without violating the exhaustion doctrine:

> As the Supreme Court held in *Vasquez v. Hillery*, 'supplement[ation] and
> clarif[ication]' of the state court factual record do not necessarily change a claim
> so dramatically as to require that the state courts be given a new opportunity to
> hear the issues.

LIEBMAN & HERTZ, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE § 23.3c, at 893-95 (3d

ed. 1998) (citing *Walker v. Lockhart*, 763 F.2d 942, 955 n. 26 (8th Cir. 1985) (en banc), *cert.*

*denied*, 478 U.S. 1020 (1986)).  A claim is fundamentally altered only if the additional factual

presentation makes the "claim[] . . . so clearly distinct from the claim[] he has already presented

to the state courts that it may fairly be said that the state courts have had **no** opportunity to pass on the claim . . . ."  *Humphrey v. Cady*, 405 U.S. 504, 516 n.18 (1972) (emphasis added).

Fifth Circuit authority follows these principles.  If the additional evidence presented in federal court "place[s] the case in a significantly ***different*** and stronger evidentiary posture than it was when the state courts considered it," *Brown v. Estelle*, 701 F.2d 494, 495 (5th Cir. 1983) (emphasis added), "the state courts must be given an opportunity to consider the evidence."  *Id*. *Accord*, *Joyner v. King*, 786 F.2d 1317, 1319-20 (5th Cir. 1986); *Hart v. Estelle*, 634 F.2d 987, 988-89 (5th Cir. 1981).  In essence, Mr. Washington's claims are exhausted unless, in light of the new evidence produced, the claims are "clearly distinct" from those brought in state court. *See Humphrey*, 405 U.S. at 516 n.18.

Any additional facts presented in Mr. Washington's federal Petition do not fundamentally alter his claim that a prejudicial conflict of interest was established when Reo Harris represented Mr. Washington in exchange for the illegal and unethical assignment of a worker's compensation settlement.  They do nothing to place the claims of a conflict of interest, which was originally pled in Mr. Washington 1989 state habeas application, in a "different and stronger evidentiary posture." *Brown*, 701 F.2d at 495.

### (b)  This Court Should Apply the Prejudice Standard of *Cuyler v. Sullivan*.

The United States Supreme Court has established a standard of prejudice in *Cuyler*, 446 U.S. at 348-50, which mandates relief if the actual conflict of interest burdening the representation adversely affected the representation.  Although Mr. Harris' acceptance of Mr. Washington's worker's compensation settlement as payment for the representation certainly did

not implicate him as a co-defendant, *see Beets v. Scott*, 65 F. 3d 1258, 1268 (5th Cir. 1995)(cited

by Respondent in its Answer at 19), counsel's action was in clear violation of Texas law.  *See*

TEX. LAB. CODE ANN. §408.202 (Vernon's 1999).  Because Mr. Harris would have been

implicated in illegal activity if the fee arrangement had been exposed, the conflict with Mr.

Washington should be considered under the *Cuyler* standard.   The reasoning behind this

conclusion is echoed in *Solina v. United States*, in its analagous discussion of the conflict

inherent when an individual who is not licensed to practice law represents a criminal defendant:

> *[t]he problem of representation by a person like Coleman is* not simply one of
> competence--he may very well have had greater competence to represent a
> defendant in a criminal trial than some leaders of the profession who are expert in
> corporate financing or estate planning but have never examined or cross-
> examined a witness--but *that he was engaging in a crime*. Such a person cannot
> be wholly free from fear of what might happen if a vigorous defense should lead
> the prosecutor or the trial judge to inquire into his background and discover his
> lack of credentials. Yet *a criminal defendant is entitled to be represented by
> someone free from such constraints*.

*Solina v. United States*, 759 F.2d 160, 164 (2nd Cir. 1983) (emphasis added). The Court in *Solina*

applied a *per se* prejudice rule to the situation where counsel was not a licensed attorney.[2]  Mr.

Washington submits that the standard in *Cuyler* is appropriate to govern the conflict of interest in

his case.

The narrow scope of the prejudice standard in *Cuyler* which was set forth by the Fifth

Circuit in *Beets* is inconsistent with the interpretations of its sister circuits and its continued

---

[2] Another interesting case, decided on grounds of fundamental fairness, gives insight into
the proper determination of Mr. Washington's conflict claim.  In *Messelt v. Alabama*, 595 F.2d
247 (5th Cir.1979), the Court held that the defendant's due process rights were violated, without
engaging in a prejudice inquiry, when, among other things, the attorney attempted to induce the
client into participating in a "drug scheme" in order to finance the defense.

viability is "uncertain". *Beets*, 65 F.3d at 1268. Regardless, however, of whether the narrow

approach set forth by the Fifth Circuit ultimately stands, the language of *Beets* implies that the

*Cuyler* standard would be applicable in light of the conflict of interest in Mr. Washington's case

because Mr. Harris was implicated in illegal activity through his acceptance of the assignment of

Mr. Washington's worker's compensation settlement.[3]

> **(c)      The State Court Factfindings are an Unreasonable
> Determination of the Facts and are Contrary to
> or an Unreasonable Application of the Law
> as defined by 28 U.S.C. § 2254(d)**

The state court factfindings relevant to Mr. Washington's conflict of interest claim are:

1.    The Court finds that the fee arrangement between the applicant and
trial counsel does not, standing alone, create a conflict of interest
that should have precluded trial counsel from representing the
applicant in the instant case.

3.    The Court further finds that there is no evidence to support the
applicant's conclusory assertion that the alleged discord between
the applicant, trial counsel Reo Harris and the workman's comp
attorney, resulting from the fee arrangement between the applicant
and trial counsel, created a conflict which affected trial counsel's
dedication to the applicant's case.

4.    The Court finds, based on the credible assertions contained in the
Court-ordered affidavit of trial counsel Reo Harris, that trial
counsel's decision not to hire private investigators was based on
trial strategy and not the result of economic necessity arising from
a conflict generated lack of funds, as alleged by applicant.

7.    The Court finds that trial counsel's representation of the applicant for

---

[3] If this Court chooses to use the *Strickland* standard to analyze Mr. Washington's
conflict of interest claim, trial counsel's ethical violations in accepting the worker's
compensation settlement as his fee certainly represents deficient performance. *See Beets*, 65
F.3d at 1271 (although they are not "constitutionalized, a Court's determination of deficient
performance is guided by standards of professional conduct"). Prejudice is demonstrated by
totality of the representation. *See Williams v. Taylor*, 529 U.S. at 416.

> $5000 does not create a per se conflict on the theory that it prevented applicant from being appointed counsel and State financed investigators. The Court further finds that because trial counsel's reason's for not hiring investigators were based on trial strategy and not lack of money, the applicant's economic conflict theory is unsupported by proof.

> 8.     The Court further finds that the applicant cannot establish harm resulting from trial counsel's decision to not hire forensic expert assistance in light of the non-inculpatory nature of the forensic evidence presented by the state.

State Court Findings at 1-2 (Exhibit 9 to Petition). The state court made one conclusion of law which read:

> 1.     Because the applicant failed to establish under any of the theories presented that there existed a conflict of interest that should have precluded trial counsel from representing the applicant in the instant case, relief should be denied.

*Id*. at 13.   These findings and conclusions are both an unreasonable determination of the facts in light of the state court record and are contrary to or an unreasonable application of the law.  *See* 28 U.S.C. § 2254(d).

In examining the state court fact findings in Mr. Washington's case under § 2254(d)(2), the Court is to decide whether the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts . . ." .  This inquiry is both an examination of the reasonableness of the findings themselves as well as the reasonableness of the process in which the state court arrived at the findings.  *See supra* Part I(B).

Mr. Washington has presented voluminous evidence which reveals the unreasonable nature of the process used by the state court in arriving at its findings.  This includes:

- After trial counsel submitted an affidavit in response to Mr. Washington's allegations of ineffective assistance of counsel which raised serious questions as to his representation, the state habeas judge, who also

9

presided over Mr. Washington's trial met ex parte with the district attorney and trial counsel and ordered trial counsel to go to the district attorney's office to prepare another affidavit.  *See* Second Amended Petition, at Part II (A)(1).

- The resulting affidavit was totally contradictory to the original affidavit submitted by trial counsel on his own.  *See id.*

- The findings of fact and conclusions of law were adopted verbatim by Judge Sam Robertson, a visiting judge. Although Judge Robertson did not conduct an evidentiary hearing, the findings he adopted relied heavily on contradictory affidavits submitted trial counsel.  *See id.* at Part II(A)(4).

- The 30-page single-spaced proposed findings, adopted by the state habeas judge *at* the hearing in which they were first submitted, were not filed with the court prior to their adoption and not served upon defense counsel.  Therefore, the state habeas judge either did not carefully review the findings before signing them or he received them ex parte. *See id.* at Part II(A)(3).

- State habeas counsel was denied resources and discovery necessary to develop Mr. Washington's case. *See id.* at Part II(A)(2).

The process of determining the facts in Mr. Washington's state court proceeding was extremely improper bordering on the absurd.  The trial judge and the district attorney literally conspired together to clean up the record of ineffective assistance of counsel created by Reo Harris' first affidavit in which he admitted that he only spent seventeen hours preparing for Mr. Washington's trial.  The state court's findings were adopted without any meaningful, let alone thorough, review.  At every turn, habeas counsel was berated by state court judges for merely attempting to do his job.  *See* Motions Hearing before Judge Lykos, October 6, 1989 at 14 (Exhibit 4, Tab D to Petition) (in denying motion for funds for a forensic expert Judge Lykos stated, "Well, of course, I'm fascinated by this hair business.  Counsel, I would suggest that you wouldn't be too persuaded by what you see on television or in movies or what you read in

detective novels . . . ");Post-Conviction Writ Hearing before Judge Robertson, September 9, 1997 at 6 (Exhibit 8 to Petition) ("I find it offensive in a way and I don't mind stating it on the record – I want it on the record – that to raise the matters that have been raised in this petition, it took some 126 pages of pleadings.").

Furthermore, the findings of fact of the state habeas court rely primarily on trial counsel's self-serving affidavit testimony that his omissions regarding investigation and the consultation of experts were the result of trial strategy. *See* State Court Findings at 1-2 (Exhibit 9 to Petition). The state court's reliance on these affidavits was "unreasonable" as well. First of all, in the context of whether findings of fact are to be presumed correct, the Fifth Circuit has stated that the reliance on affidavits to resolve factual issues is not sufficient. In *Nethery v. Collins*, 993 F.2d 1154, 1157 n.8 (5th Cir. 1993) the court discounted state court findings based upon a "paper record" stating:

> Findings based solely on a paper record are not necessarily entitled to a presumption of correctness. *Ellis v. Collins*, 956 F.2d 76 (5th Cir.1992). "[I]t is necessary to examine in each case whether a paper hearing is appropriate to the resolution of the factual dispute underlying the petitioner's claim." *May v. Collins,* 955 F.2d 299, 312 (5th Cir. 1992). Notably, and for obvious reasons, unlike the petitioners in *Ellis* and *May,* Nethery's petition was not considered by the same judge who had presided over his trial; thus, there was never a meaningful opportunity for the court to assess the credibility of the conflicting affiants.

In Mr. Washington's case, Judge Robertson, who adopted the Harris County District Attorney's 30-page single-spaced proposed findings without any modification whatsoever, did not preside over Mr. Washington's trial or even a significant portion of the state habeas proceedings. Furthermore, the Court's reliance on Mr. Harris' affidavits is unreasonable on its own merits due to the inconsistencies between the first and second affidavits. The Court made no attempt to

11

resolve the inconsistencies in the affidavits and merely found both to be "credible."  *See* State

Court Findings at 2 (Exhibit 9 to Petition).  In fact, one would not even know that two disparate

affidavits were filed from reading the state court findings.  *See id.* (Findings consistently refer to

"cre dible assertions contained in the court ordered affidavit of trial counsel Reo Harris", but do

not specify which affidavit or even indicate that two exist).  Considering (1) that the state court

findings were made absent a live hearing, by a judge who did not preside over the trial or most of

the state habeas proceeding; (2) the great irregularity in how the court "determined" the facts;

and (3) the court's failure even to acknowledge basic inconsistencies in the primary evidence on

which it based its denial of Mr. Washington's ineffective assistance and conflict claims, the state

court's determination of these facts was clearly "unreasonable" in light of the evidence presented

in the state court proceeding.  28 U.S.C. § 2254(d)(2).

> **(d)** **If This Court Does Find That Mr. Washington's Claims of Ineffective Assistance of Counsel and Conflict of Interest Were Not Fairly Presented to the State Court, Exhaustion Would be Futile**

Although Mr. Washington believes that his claims regarding his trial counsel's conflict of

interest and ineffective assistance of counsel were fairly presented to the state court, if this Court

believes that the new evidence developed in this federal habeas corpus proceeding places Mr.

Washington's ineffective assistance of counsel and conflict of interest claims in "a significantly

different and stronger evidentiary posture than it was when the state courts considered it," *Brown*

*v. Estelle*, 701 F.2d at 495, this Court should still refrain from dismissing Mr. Washington's

petition for a writ of habeas corpus because exhaustion in his case would be futile.  *See Carter v.*

*Estelle*, 677 F.2d at 446 n. 16.

Mr. Washington's ineffective assistance of counsel and conflict of interest claims are technically exhausted because, if this Court were to dismiss Mr. Washington's petition for exhaustion, the state court would clearly dismiss the application as an abuse of the writ. TEX. CODE CRIM PROC. Art. 11.071§5 governs the state court's consideration of successive application for a writ of habeas corpus. A successive application is barred under § 5 unless:

> (1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application . . . because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application.

The only exception to this restriction is when an applicant can show either by a preponderance of the evidence, that no rational juror would have found the applicant guilty, or by clear and convincing evidence that no rational juror would have sentenced the applicant to death. *See* art. 11.071 §5 (2),(3).

Mr. Washington raised his claims of ineffective assistance and conflict of interest in his initial application for a writ of habeas corpus in state court. The language of the statute is clear and unambiguous and the Texas Court of Criminal Appeals has been consistent in dismissing applications which raise the same claim that was raised in a previous application. There is simply no provision in the statute for consideration of a claim which has been raised in a previous application, but re-filed with stronger evidentiary support.[4] Therefore, exhaustion of Mr.

---

[4] Art. 11.071 §5 (2),(3) would allow review of such a claim only if it can be proven that, but for the constitutional violation, the evidence would be insufficient to establish guilt or to support the jury's sentence of death. Mr. Washington has not so alleged.

Washington's ineffective assistance of counsel and conflict of interest claims is futile.[5]

> **(e)      Mr. Washington Has Not "Failed to Develop" the Factual Basis of His Claims**

If this Court finds Mr. Washington's conflict of interest and ineffective assistance of counsel claims are "significantly different" and in a "stronger evidentiary posture" then those presented to the state court, *Brown*, 701 F.2d at 495, and that Mr. Washington's claims are technically exhausted, Mr. Washington has not failed to develop the factual basis of his claims and therefore has met the requirement of 28 U.S.C. §2254(e)(2) for review.  During the state habeas proceeding, Mr. Washington repeatedly made detailed requests for discovery, investigative and expert resources, and an evidentiary hearing.  His requests were denied at every turn.

Prior to filing his application for a writ of habeas corpus, state habeas counsel filed a motion for discovery and expert assistance along with a memorandum in support.  *See* Petitioner's Memorandum of Authorities and Argument in Support of His First Pre-Petition Motion for Discovery and Expert Assistance, *Ex Parte Washington*, No. 449603 (180th Dist. Ct.) [Memorandum](Exhibit 4, tab B to Petition).  State habeas counsel argued that pre-petition discovery and expert and investigative resources were required because there was evidence that trial counsel:

> 1)      discouraged the petitioner from claiming his right to a court appointed attorney, who in turn could have requested badly needed court appointed experts;

---

[5] Mr. Washington has also alleged in his petition that exhaustion is excused because circumstances exist which render the state court process ineffective to protect his rights.  *See* Petition, at Part II(B).

2)      discouraged the petitioner from hiring his own private investigator;

3)      failed to interview witnesses;

4)      made no meaningful, independent investigation of the facts before
        trial; and did not consult with or retain independent expert
        witnesses with respect to the forensic evidence that was crucial to
        the defense in this case.

Memorandum at 5.  These allegations were supported by the affidavit of Gary Reger which

details the fact that trial counsel's file consisted of a mere 56 pages and did not contain evidence

of any pretrial investigation.  Affidavit of Gary Reger at 2 (Exhibit 4 tab C to Petition).  The

affidavit also explains that the Harris County District Attorney refused to allow Mr. Reger access

to that office's file.  *Id*.  It further asserts that through Mr. Reger's investigation, he learned that:

> several witnesses were identified for Mr. Harris that could refute the State's
> contentions that Mr. Washington had changed clothes and was present at the site
> of the alleged shooting at the times contended.  Mr. Harris did not interview or
> call these possible witnesses.

*Id*. at  4.  Based on this showing of trial counsel's failure to investigate, state habeas counsel

asked that the court grant him discovery and investigative and expert assistance in order to

pursue claims of ineffective assistance of counsel.  Memorandum at 5-6.  Specifically, the

memorandum states that counsel must prove prejudice, thus implying that it was necessary to

conduct the investigation which counsel failed to complete. *Id*.

In the motion and memorandum, state habeas counsel requested exactly the resources and

information which have supplemented Mr. Washington's federal habeas petition.  Specifically,

counsel requested depositions of trial counsel and the custodian of records of the Houston Police

Department and the Harris County District Attorney's Office.  Pre-Petition Motion at 7 (Exhibit

4, tab B to Petition).  Furthermore, state habeas counsel articulated the specific purpose for

15

which he sought this discovery – to prove the ineffective assistance of counsel claims which are now before this Court.

Mr. Washington's pre-petition motion for discovery and investigative and expert assistance was denied at a hearing before the trial judge, except for access to forensic reports kept by law enforcement and some medical records held by the District Attorney and the District Clerk. *See* Motions Hearing, October 6, 1989 (Exhibit 4, Tab D to Petition).

Mr. Washington filed his application for a writ of habeas corpus on April 12, 1990. The application raised many issues including claims of ineffective assistance of counsel based on a conflict of interest, a failure to investigate, and numerous other grounds. Mr. Washington requested an evidentiary hearing on all of his claims.

Relying on the arguments set forth in his state habeas petition, Mr. Washington then filed additional requests for expert and investigative assistance and discovery. Specifically, Mr. Washington requested production of documents from trial counsel Reo Harris, from the Harris County District Attorney's Office and the Houston Police Department, and depositions of Mr. Washington's trial attorneys and the prosecution team. *See* Post-Petition Motion for Discovery (Exhibit 4, Tab F to Petition). Mr. Washington also repeated his request for investigative and expert assistance. *See* Post-Petition Motion for Appointment of Counsel and Expert Assistance (Exhibit 4, Tab E to Petition). Mr. Washington supplemented his discovery request in light of the second affidavit produced by Mr. Harris and the Harris County District Attorney's Office. *See id.* at Tab H (First Supplement to Discovery Motion). All of these requests were summarily denied in the hearing in which Judge Robertson adopted the State's findings of fact and conclusions of law. *See* Post-Conviction Writ Hearing, September 9, 1997 (Exhibit 8 to

16

Petition).

At every opportunity, Mr. Washington attempted to develop the very facts which now support his claims. He made specific requests for the production of documents, depositions, and investigative assistance which were supported by factual information and later reference to his application for a writ of habeas corpus. Not only were these requests denied, but counsel was berated by the state habeas judge for even making the requests. A petitioner can only be found to have "failed to develop" the factual basis of his claim under 28 U.S.C. § 2254(e)(2) if the absence of factual development in state court was the result of an "omission, fault, or negligence." *See Williams*, 529 U.S. at 431. The absence of any factual development relating to Mr. Washington's claims of ineffective assistance of counsel and conflict of interest certainly can not be attributable to his omission, fault, or negligence. Mr. Washington made numerous specific requests, which were all summarily denied.

The Fifth Circuit's position on Mr. Washington's situation is clear:

> for the purposes of 28 U.S.C. § 2254(e)(2), a petitioner cannot be said to have "failed to develop" a factual basis for his claim unless the undeveloped record is a result of his own decision or omission . . . If it were, "a state could insulate its decisions from collateral attack in federal court by refusing to grant evidentiary hearings in its own courts."

*McDonald v. Johnson*, 139 F.3d at 1059 (citing *Love v. Morton*, 112 F.3d 131 (3rd Cir.1997) and *Burris v. Parke*, 116 F.3d 256, 258 (7th Cir. 1997)). *McDonald* addresses the same callous manner in which Mr. Washington's state habeas proceeding were adjudicated by endorsing federal review of new factual development in federal habeas proceedings. This approach balances the interests of the State in fairly presiding over challenges to its own convictions with

the ultimate goal of ensuring that Mr. Washington's conviction passes constitutional muster.  In light of the state court record, this Court must now review Mr. Washington's claims, supported by all of the evidence in the record.[6]  To do otherwise would allow the state of Texas to insulate Mr. Washington's conviction from any meaningful review.  *See McDonald*, 139 F.3d at 1059.

### (f)      Conclusion.

Counsel's abominable approach to Mr. Washington's capital defense was epitomized by the very arrangement whereby the representation was undertaken.  Counsel's slipshod and substandard performance was born of ethical violations and went downhill from there.  Mr. Washington was saddled with a lawyer who not only lacked commitment and loyalty to his client's life-and-death cause, but lacked the wherewithal with which to promote and advance it.  Mr. Washington was thus doomed and the outcome was virtually predestined.  The harm to Mr. Washington is manifest as set out throughout his Petition.

### A.4.      Ineffective assistance of counsel during voir dire.

Again, Respondent urges that this claim is barred because it is unexhausted: "In denying the state court a fair opportujnity to review this claim, he fails to meet the exhaustion requirement." Answer at 24.  The claim was presented to the state courts in Mr. Washington's

---

[6] For the same reasons that the state court findings would be considered unreasonable under 28 U.S.C. § 2254(d)(2), Mr. Washington has clearly rebutted the presumption of correctness of the state court fact findings as required by 28 U.S.C. 2254(e) (1).  *See supra* Part I(B); *see also* Second Amended Petition, at Part II(A).

Mr. Washington has also shown cause for any procedural default.  His showing that he has met the requirements of §2254(e)'s failure to develop language is equivalent to cause.  *See Barrientes*, 221 F.3d at 771.  Prejudice is simply an examination of the merits of Mr. Washington's claims.

Second Application for a Writ of Habeas Corpus, filed in the trial court on February 7, 2002.

The claim was raised as Claim A.3, "Ineffective Assistance of Counsel - Voir Dire," at 58-73.

As set forth in his Petition, Mr. Washington was unable to raise the claim earlier due to the

unavailability of an effective state court in which to raise it.  Thus, exhaustion is excused under

28 U.S.C. 2254 § (b)(1)(i)and (ii). inability to raise the claim earlier.

Trial counsel's exercise of juror challenges was totally haphazard and seemingly random.

There was truly no rhyme or reason to his strikes and his failure to strike; there was no

semblance of method to his madness.  Counsel moved to strike favorable jurors and readily

accepted hostile ones.  It actually appears that he was trying to empanel as unfavorable a jury as

he could.

For example, counsel moved to strike Juror Lucille Van Allen despite her consistently

favorable voir dire responses.  Juror Van Allen stated that she did not think she would vote to

impose the death penalty even if the State proved that the murder was "deliberately committed

and it was a heinous crime" unless she was personally convinced the defendant "would do this in

the future."  2 RR 84.  Even when pressed by defense counsel on this key point, Ms. Van Allen

said she would vote "no" on Special Issue #2 even if there was evidence "they had robbed the

man and tortured him, slow tortured him" *and* even if "the other 11 jurors back there . . .

believed the State had proved beyond a reasonable doubt Special Issue No. 2."  Ms. Van Allen

was unequivocal:

Q.     In that instance how would you vote?

A.     No.

2 RR 97.  Nevertheless, defense counsel, inexplicably, moved to disqualify Ms. Van Allen for

19

cause.  2 RR 105.  On the other hand, counsel – *who did not even exhaust his allotment of peremptory challenges* – acquiesced to the seating of jurors who were vehemently and unalterably in favor of imposing the death sentence, who were candidly hostile to the defendant's exercise of his constitutional rights, who indicated racial bias and who were openly contentious towards defense counsel.

It is important for this Court to have a flavor for defense counsel's utter lack of zealousness in this key aspect of capital trial representation.  For that reason, several examples are offered here to show the extent of counsel's ineffective performance in selecting a fair and impartial jury.  The following excerpts depict voir dire examination of flagrantly unfavorable jurors who sat on Mr. Washington's jury and who were permitted to serve despite the fact that the defense had not used up its peremptory challenges.

Henry Weldon Necessary.

Juror Necessary was emphatic that once the defendant was found *guilty* of *murder*, he would necessarily have to answer Special Issue No. 1, "yes":

> Q.    And my question to you is: That after you have found someone guilty of capital murder, can you still answer Special Issue No. 1 no?
>
> A.    No. 1 no?
>
> Q.    Yes, sir.
>
> A.    I believe that if we done decided that he committed murder –
>
> Q.    M-h'm.
>
> A.    – I would say that was No.1 would be a yes.
>
> .                              .                              .

20

Q.      Okay.  Let me ask you this: Can you conceive of *any set of circumstances* that after you have found somebody guilty of capital murder that you could answer no or would you always have to answer yes?

A.      I say the Issue No. 1 –

Q.      Yes, sir.

A.      If you found him guilty of capital murder, No. 1 would be a yes.

Q.      Okay.  And it would be yes, *without any mental reservations or anything?*

A.      Right.

10 RR 1276-1277.  Here, again, counsel not only neglected to move for a challenge for cause, on clearly meritorious grounds, counsel failed to exercise a peremptory challenge for a juror who stated unequivocally that he would automatically vote for the death sentence once the defendant was found guilty.  10 RR 1282.

<u>Kenneth Ray Forbis</u>

Juror Forbis stated he "didn't understand" Court's explanation that the defendant is not required to testify and "if he or she doesn't testify you can't hold it against him."  15 RR 1846.  Upon further explanation, he stated "I don't get it."  15 RR 1847.  As to the difference between "regular murder and capital murder, Forbis stated "I don't know if there's that big a difference in it or not."  15 RR 1851.  As to the applicability of the death penalty, he stated:

A.      If you had the death penalty, you just ain't got to worry about the people that are – that really are going to get out and get in trouble all the time.

15 RR 1852.  Pressed on whether he had ever "heard or read about where people have gotten the death penalty [and thought] that maybe they shouldn't have gotten the death penalty, Forbis replied:

A.      Well, I haven't paid that much attention, but the ones I seen, my opinion, pretty

well deserved it, what they did and the way they did it.

15 RR 1852-1853.  On the burden of proof, he stated "Well, you just have to prove it was done."

15 RR 1854.  He stated that a "probability" of future dangerousness is closer to a "possibility"

than a certainty.  15 RR 1863.  He also said that being divorced and the sole support for three

children, serving on the jury would create considerable hardship both in terms of his children's

care and in losing income to pay for their nursery: "That would create a problem having to pay

for the nursery."  15 RR 1873.

A.      It's going to [put me in a bind when I'm here, yeah.  Put me in a bind.  Put me in
a bind with the nursery.  After it gets all over with it will – puts a strain, but if I got to, I
got to.

THE COURT:          Would you like to light up a cigarette?

THE PROSPECTIVE JUROR:          I just got through one, thank you.

15 RR 1873-1874.

Asked by defense counsel whether he would want to hear from the defendant, Forbis was

fuzzy:

Q.      Can you see how that would not be fair to the person on trial?

A.      Well, yes and no.  I guess in a way . . .

15 RR 1890.  Forbis even waffled on whether he would be able to vote "no" on Special Issue No.

1 even if the State failed to prove it:

Q.      Okay and if the State failed to prove to you beyond a reasonable doubt that the
answer should be yes, would you answer it no?

A.      *I don't know.*

22

15 RR 1894.  Despite all this, defense counsel failed to use a peremptory challenge to strike juror

Forbis and accepted him on the jury 15 RR 1900.

> Walter E. Bohannon

> A.     Well, I think that if somebody takes another person's life and he is guilty, that he
> doesn't deserve to live, either.

8 RR 971.

> A.     Well, I – I've thought that the – that the judicial system has been very, very lax in
>
> bringing a lot of things to justice . . . there's too many people that get off for too
>
> many things.  You know, murder being one of them.

8 RR 972.

> Pamela Pulliam

> Juror Pulliam implied that she would have difficulty following the Court's instructions to

disregard inadmissible evidence:

> . . . when they tell you that that's not admissible or, however, that we should not pay
> attention to that . . . do you really drop that one point?  I mean, you should, but it's
> always in the back of your mind . . .

22 RR 2600.  Likewise, Ms. Pulliam did not seem to understand the distinction between

"intentional killing," as required for conviction, and "deliberation" as part of the capital

punishment determination:

> Q.     So, he could form that decision to deliberately kill someone?

> A.     Instantly.

22 RR 2609.  With regard to the meaning of "probability" for purposes of Special Issue No. 2,

Ms. Pulliam testified:

Q.      Do you see probability as being closer to a possibility ot closer to a certainty?

A.      Possibility.

22 RR 2610.  Asked whether "the fact that defendant in this case is a black man" would affect

her ability to judge his guilt or innocence fairly, she replied:

A.      No.  I worked with too many of *them*.  There are too many *good ones out there*.

22 RR 2615.

After thirty-seven (37) pages of voir dire examination by the Court and prosecutor, Ms.

Pulliam introduced herself to Mr. Washington's African-American attorney as follows:

EXAMINATION BY MR. HARRIS:

Q.      Is it Miss Pulliam?

A.      Pulliam.

Q.      Pulliam, okay. . . . we want to thank you for being down here this morning, okay?
        - and we further apologize for any inconvenience you may have been caused by
        being down here, okay?

A.      We'll send you my six-fifty parking bill.

Q.      Ma-am?

A.      I'll send you my parking bill.

Q.      All right.

A.      No problem.

22 RR 2619.  In response to a question of whether her co-workers and neighbors might influence

her ability to be a fair juror, Ms. Pulliam stated:

A.      Do I make a comment?  All of them at work don't want me to take time off
        because we're extremely busy right now, but if it happens, it happens.  *They said
        just "hang them,"* not knowing what kind of trial it is or anything else.  That's

24

what they said.

.                    .                    .

    A.      People tend to talk.

22 RR 2628.

Juror Pulliam manifested a definite problem with regard to the defendant's exercising of

his right not to testify:

    Q.      Now, Miss Pulliam, you know the Judge instructed you that the defendant does not have to testify?

    A.      Right.

    Q.      Okay. . . . How do you feel about that?
    A.      Personally, I probably would want to defend myself.  I mean, I would want an attorney, but I would want to say something in my behalf.

    Q.      M-h'm.

    A.      So, that's up to that individual to *explain why it happened*.

    Q.      Ma'am

    A.      I would like to *explain why it happened*.

22 RR 2631.

Ms. Pulliam stated that she would necessarily believe the testimony of police officers:

    A.      I have had – I have had no run-in's or anything with police officers.  So, *I'm going to take their credibility as evidence and I'm going to believe them.*

.                    .                    .

    Q.      . . . . Would you ever disbelieve one?

    A.      *I don't think I would have a reason to.*

.                    .                    .

25

A.      *I will believe – I will believe him.*

                    .                 .                 .

A.      The police officer's testimony.

22 RR 2634-2635.

Even after lengthy and laborious back-and-forth about the standards of proof, Miss

Pulliam *still* got it wrong:

Q.      (BY MR. HARRIS) If they proved to you that he *possibly* committed this offense,
        okay?  – would that satisfy your criteria of reasonable doubt?

A.      Yes.

22 RR 2646.

Notwithstanding all of the above, and despite the fact that the defense had not exercised

all of its peremptory challenges, and the fact that 11 jurors had already been selected and seated,

counsel nevertheless accepted Ms. Pulliam as a juror.  22 RR2649

Clearly, with regard to jury selection, Mr. Washington's attorney was the functional

equivalent of "no counsel at all."  *Strickland v. Washington,* 466 U.S. 668, 694 (1984), *Cronic v.

United States,* 466 U.S. 648, 658 (1984).

### A.5.   Counsel failed to ensure that the prosecution did not excuse African American jurors with peremptory challenges in violation of *Batson v. Kentucky.*

#### (a)      Exhaustion and default: the *Batson* claim is fully exhausted.

Mr. Washington's *Batson* claim is properly before this Court.  Pursuant to the Court's

Order of December 7, 2001, dismissing his federal habeas petition without prejudice, Petitioner

raised and briefed the very same *Batson* issues in Claim 4.A. (at pp. 73-86) of his Second

Application for a Writ of Habeas Corpus, filed in the 180th Judicial District Court of Harris

County, Texas, on February 7, 2002.

Respondent mistakenly asserts in its Answer: "This claim was not presented to the state

court for review.  As such it is unexhausted and procedurally barred."  Answer at 35.

Respondent, respectfully, is flat-out wrong in such an assertion, as noted above.  Respondent

reiterated this fallacy later in its Answer, after quoting from the December 7, 2001, Order of this

Court remanding the case to state court for exhaustion of, *inter alia*, the instant *Batson* claim.

Respondent inaccurately submits:

> Washington returned to state court and filed two successive petitions raising
> several *Brady* claims arising out of the document recently disclosed in federal court. . . .
> Washington did not raise a *Batson* claim or the current ineffective assistance claim,
> alleging that counsel should have made a *Batson* challenge during voir dire.  Although
> Washington may have had cause not to raise these claims in his original state writ
> application, he is without excuse for failing to raise them in a successive petition after the
> Court specifically dismissed the federal proceedings to allow him the opportunity to do
> so.  Consequently, this Court may not grant relief here.

Answer at 37-38.

Respondent is again mistaken.  Mr. Washington raised the instant claim thoroughly and

in detail in his Second Application for a Writ of Habeas Corpus and as supported in an

accompanying five-volume appendix.  Indeed, included in Exhibit Volume 4 of 5 submitted to

the state courts in February 2002, were the juror strike sheet (Ex. 21), the jury questionnaires

belatedly disclosed from the prosecution files containing the handwritten letter "B" on the

questionnaires of all African American venirepersons excused for cause (Ex. 22), photocopies of

the driver licenses of three of the peremptorily struck jurors confirming their race as "Black"

(Ex. 23), and the questionnaires of the minority members removed by the State with peremptory

challenges with the telltale "B" notations. (Exs. 24-29).

In short, the *Batson* claim is fully cognizable herein.

As this Court is probably aware, Mr. Washington could not have raised this claim in his original state habeas petition because the jury questionnaires documenting the prosecutor's racial animus were not disclosed until the case was in federal court and subject to the fair discovery procedures afforded there.  It is worth noting for the record that Mr. Washington filed a motion for discovery in state court prior to filing his state habeas petition seeking access to the Harris County District Attorney's file.  *See* Pre-Petition Motion for Discovery (Exhibit 4, Tab B to Second Amended Petition).  In his motion, Mr. Washington explicitly mentioned that this discovery was intended in order to support a colorable *Batson* claim.  *Id.* at 4 ("even with the sparse facts available to undersigned counsel, it is clear that colorable *Penry*, *Batson*, and *Caldwell* issues exist in this case").  State habeas counsel, Gary Reger, filed an affidavit in support of his motion explaining his informal efforts to obtain access to the District Attorney's file:

> I requested the Harris County District Attorney to allow me to review its complete file in this case. The District Attorney refused.  Alternatively, I asked the District Attorney to allow me to review that part of the file that Mr. Harris had been allowed to review prior to trial (as evidenced by statements to that effect in the trial transcript).  Again the District Attorney refused.  All that the District Attorney would allow me to review were any statements by Willie Terion Washington, if any, that were in the State's file (to date, none have been provided).

Affidavit of Gary Neale Reger at 2 (Exhibit 4, Tab C to Petition).

At a hearing, the Assistant District Attorney Caprice Cosper explicitly stated that Mr. Washington was not entitled to discovery of the State's file, and the trial judge denied the

28

request. *See* Motions Hearing October 6, 1989 at 20 (Exhibit 4, Tab D to Petition). The court

made it perfectly clear that Mr. Washington was not entitled to discovery of the State's file and

that the court was not willing to examine the file *in camera*. *See id*. at 20. Mr. Washington

made a second request for discovery of the State's file after the filing of his Application. *See*

Post-Habeas Petition Motion for Discovery (Exhibit 4, Tab F at Schedule B to Petition).

The Respondent's position in light of the record in Mr. Washington's case is similar to

the position it took in *Barrientes v. Johnson*, 221 F.2d 741, 767 (5th Cir. 2000). In *Barrientes*,

the Respondent argued that the Petitioner had not been diligent in state habeas proceedings in

seeking exculpatory evidence, despite the fact that the defense had requested access to the file in

discovery motions and had those motions denied. *Id*. The Court held that:

> the State's attempt to persuade us that Barrientes should have jumped through
> some different hoop after being told time and time again . . . by the District
> Attorney's Office that he has no legal right to review the files, is, . . .
> unpersuasive
>
> ***
>
> If the State is suggesting that Barrientes should have gone back to Court after the
> two motions were denied, we can only wonder at what point the State would
> suggest Barrientes take "no" to mean "no".

*Id*. Similarly, state habeas counsel filed motions for discovery and attempted to obtain the Harris

County District Attorney's file informally. At every turn, his requests were denied. The

Respondent apparently believes that Mr. Washington should have asked for the prosecutor's file

in some different way in order to be diligent. As in *Barrientes*, Mr. Washington should not be

punished for taking "no" to mean "no".

**(b)      The merits: "comparative juror analysis" generally.**

"Regardless," of the exhaustion issue, Respondent contends in its Answer, the instant

29

*Batson* claim "lacks merit."  Answer at 35.  In Respondent's view, the failure of Mr.

Washington's lawyer to object to the prosecutor's peremptory challenges of all minority jurors

was "entirely reasonable."  Answer at 39.  Respondent further suggests that "race neutral"

explanations" for the strikes "are readily apparent on the record."  *Id.* at 39-40.  None of these

purported "explanations"suffice, however, for defeating Mr. Washington's *Batson* claim.

Indeed, the "race neutral" reasons proffered by Respondent for the prosecutor's strikes of black

potential jurors are as applicable – indeed, are *more* applicable – to the voir dire responses of

*white jurors* who were accepted by the prosecutors.  In other words, "the State accepted many

white jurors who had the same characteristics" as the black jurors struck.  *Reed v. Quarterman*,

No. 05-70046, 2009 U.S. App. LEXIS 579 at *12 (5th Cir. January 12, 2009) (granting new trial

due to *Batson* violations committed at trial in 1983), citing *Miller-El v. Dretke,* (*Miller-El II*),

545 U.S.  231 (2005) for this proposition at *16 *et seq*.

The Fifth Circuit has repeatedly emphasized in recent rulings that *Miller-El II* "requires"

consideration of a "comparative juror analysis" in a Batson claim.  *Reed, supra,* at *23, *citing*

*United States v. Brown*, No. 05-20997, 2008 U.S. App. LEXIS 26431, 2008 WL 5255903, at

*19-20 (5th Cir. Dec. 18, 2008).   In *Reed,* the Fifth Circuit quoted the Supreme Court on this

crucial point:

> If a prosecutor's proffered reason for striking a black panelist applies just as well to an
> otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove
> purposeful discrimination. . .

*Reed,* 2009 U.S. App. LEXIS at *30, quoting *Miller-El II,* 545 U.S. at 241.[7]

---

[7]  The Fifth Circuit also stressed in *Reed* that "*Miller-El II* held that all of the voir dire was part
of the 'evidence' before the 'state courts,' even though the defendant did not present

30

In its Answer, Respondent significantly mischaracterizes the record of voir dire responses and comments of white jurors who were accepted by the trial prosecutors and African American jurors who were peremptorily excused by the prosecution.  Contrary to Respondent's assertions, Mr. Washington's prosecutors accepted *seven* white jurors and an alternate jurors whose voir dire responses were indistinguishable, for all practical purposes, from the responses cited in Respondent's answer as race-neutral justifications for striking black and Latino jurors.

Before examining the purported "race-neutral" reasons advanced by Respondent, and comparing the voir dire testimony of white jurors who were accepted, it must be noted that the voir dire testimony of the white jurors accepted by the State need not be "identical" to that of the minority jurors struck:

> A per se rule that a defendant cannot win a Batson claim unless there is an exactly identical white juror would leave Batson inoperable; potential jurors are not products of a set of cookie cutters.

*Miller-El II,* 545 U.S. at 247, n.6, quoted in *Reed,* at *31.  The *Reed* Court noted that "Miller-El's comparative analysis also reveals several principles to guide" the consideration of asserted *Batson* violations:

> First, we do not need to compare jurors that exhibit all of the same characteristics. [*Miller-El II*] at 247 n.6.  If the state asserts that it struck a black juror with a particular characteristic, and it also accepted nonblack jurors with that same characteristic, this is evidence that the asserted justification was a pretext for discrimination, even if the two jurors are dissimilar in other respects.  *Id.* At 241.  Second, if the State asserts that it was concerned about a particular characteristic but did not engage in meaningful voir dire on that subject, then the State's failure to question the juror on that topic is some evidence

---

thecomparative analysis theory [to the state courts] and referred only to the voir dire of the challenged jurors." *Reed* at *29.   Because "the entire voir dire transcript did not disappear from the record for purposes of federal habeas reviews," *id.* at *28, the Court held that the claim "and the comparative analysis, which is a theory that relies upon the voir dire – is properly before this court on habeas review."  *Reed*, at *29.

that the asserted reason was a pretext for discrimination.  *Id.* At 246.

*Reed,* at \*33.

### (c)  The purported "race-neutral reasons" for striking all minority venirepersons.

In its Answer, Respondent posits various purported "race-neutral reasons" for the prosecution's striking all African American and Latino  potential jurors.  These asserted reasons derive from  the prosecutors' notations apparently made during jury selection on the jury questionnaires of the minority jurors and from the trial record of the minority venirepersons' voir dire responses.  The reasons advanced by Respondent for striking all minority members are, in short:

(1)  expressing "views that could potentially undermine the State's effort to secure a death sentence" (Answer at 41);

(2)  an ostensible reluctance to vote "yes" on Special Issue No. 2 concerning the defendant's propensity for posing a danger to society in the future (juror Lewis, Answer at 48);

(3) requiring more than a "reasonable doubt" on punishment issues; (juror Knight, Answer at 42-44);

(4) requiring more evidence of violence than merely the instant offense alone in order to vote "yes" on Special Issue No. 2 (juror Dykes, Answer at 40, 47; juror Lewis, Answer at 49);

(5) "qualms about who was deserving of death" (juror Lewis, Answer at 49);

(6) expressing the belief that a "probability" of future dangerousness is closer to a "certainty" than to a "possibility," (juror Hernandez, Answer at 50); and

(7) demeanor, e.g., appearing "emotionless," speaking in a flat voice" and not smiling

32

(juror Lewis, Answer at 40, 49); "arms folded" (juror Knight, Answer at 40).

> **(d)**    **Comparative analysis of the white jurors accepted by the prosecution.**

As the following excerpts from the voir dire record clearly illustrate, the reasons proffered by Respondent for striking *all* minority members from Mr. Washington's jury are equally or more applicable to fully *half* of the twelve white jurors accepted by Mr. Washington's prosecutor – a prosecutor with a long and notorious history of racially discriminatory jury selection.

> **(i)**    **"Views that could potentially undermine the State's effort to secure a death sentence" and "qualms" about "who is deserving of death."**

Respondent argues in its Answer that Mr. Washington's *Batson* claim "ignores significant voir dire testimony indicating that [the struck minority] jurors held views that could potentially undermine the State's effort to secure a death sentence against him."  Answer at 41.  Yet the same is true of many white jurors accepted by the State:

<u>Lucille Van Allen</u>

Caucasian juror Lucille Van Allen candidly expressed ambivalence about the death penalty yet, unlike African American jurors who had evinced more willingness to consider and impose death, she was accepted by the State and allowed to serve on Mr. Washington's jury. Indeed, the *prosecutor* himself expressed concern and even "nervousness" that Ms. Van Allen's voir dire responses were equivocal with regard to the death penalty, as the following excerpt demonstrates:

> Q.    I would like to start off with regarding capital punishment (sic) and ask you if it's a fair statement to say that you believe that capital punishment is an appropriate

punishment for a capital crime?

A.    *I guess that's a fair statement.*

Q.    . . . . *You seem a little hesitant about that.*

.          .          .

Q.    You ever in a position or taken side in an argument where you argue that the death penalty was not an appropriate punishment for a capital crime?

A.    No, *I don't think so.*

Q.    Now, as you know that capital punishment would apply in only capital crimes . . . one of which is a murder during the course of a robbery.  Do you think that kind of crime is the one that you could assess the death penalty if the evidence warranted it?

A.    *I think so.*

Q.    Okay.  Now, I'll tell you right up front that *I get a little nervous when you say "I think so . . . I need a "yes" or a "no" answer. . . .*

A.    *I think* if I believe that it was intentional that I could assess a capital punishment.

2 RR 50-52.

Juror Van Allen was likewise less than forceful when asked whether she could infer that there was an "intentional killing" based on testimony from someone other than the defendant:

A.    *I think so.*

2 RR 59.

<u>Phyllis Barry Waters</u>

Juror Waters expressed reluctant support for the death penalty, telling the prosecutor "there are times" when it is appropriate but that "I wish it weren't so. . . I can reason places where I would consider it. . . It would be nice if it weren't one of the answers, but I think it has to

34

be." 4 RR 370-371.

The State inquired as to Ms. Waters' feelings about the need for the prosecution to prove

a motive.  Her answer was not favorable to the State:

> Q.      [W]e can't always show what the motive is . . . the indictment doesn't say
> anything about the motive.  Do you feel, yourself, that you would require proof of
> a motive before you could convict someone?
>
> A.      I think it would be very important, yes.

4 RR 374.  Later, on questioning from defense counsel, Ms. Waters even went so far as to state

that she would really prefer not to be on the jury:

> A.      I would just as soon not, but –
>
> Q.      Ma'am?
>
> A.      I would just as soon not, but not because I wouldn't be fair.

4 RR 402.

Linda Mae Cashiola

The State inquired about Juror Cashiola was very clear that she was not an ardent supporter of capital punishment

and that, in fact, at an earlier time in her life, she was against it:

> A.      And it depends on the crime that they would do to commit (sic) to whether they
> should get death or not.
>
> Q.      Do you recall any tine in your past where you were opposed to the death penalty
> in general?
>
>                          .                  .                  .
>
> A.      20, 25 years ago.

18 RR 2152-2153.

> Q.      . . . . So, are you telling us that you would not give the death penalty in all capital

murders, regardless of the facts?

A.      No.

Q.      Now –

THE COURT: No, you would; or no, you would not?

THE PROSPECTIVE JUROR:      No, I wouldn't.

18 RR 2200.

Sammy O'dell Jorgenson

Juror Jorgenson stated from the outset that he had mixed feelings about the death penalty:

Q.      When you heard about those [death penalty cases being tried here in Houston] or

read about those instances. . . were there situations where you thought that the

death penalty shouldn't have been assessed in that case from what you read about

it or heard about it?

A.      There has been times, yes, that I have – I haven't agreed with it from what I read .

14 RR 1700-1701.  As to his approach to judging the credibility of the State's witnesses, Mr.

Jorgenson indicated he might be a tough sell:

A.      Well, you take everything with a grain of salt every now and then.

14 RR 1709.

Beverly Ann Long

Ms. Long likewise indicated significant ambivalence about the death penalty:

A.      I think if you found either one of these [Special Issues] to be, you know, not
completely true, that the person should get life.  I mean they shouldn't get the
death penalty.  They should get life.

19 RR 2288.

(ii)     **Hesitancy about voting "yes" on Special Issue No. 2; requiring "more than reasonable doubt" to vote "yes"; and requiring more evidence than merely the instant offense in order to vote "yes" as to future dangerousness.**

Respondent explains the peremptory striking of African American juror Mable Lewis, in part, by asserting: "Lewis first displayed hesitation regarding evidence she would find sufficient to answer the second special issue."  Answer at 47.  Yet the same can be said of numerous white jurors accepted by the state:

Juror Van Allen

Ms. Van Allen equivocated as to the effect a defendant's criminal background would have on her ability to answer "yes" on Special Issue 2 as to the likelihood of the defendant's future dangerousness:

> Q.     Do you think that if someone had a criminal background that that might help you in answering that question?
>
> A.     *I don't know.*

2 RR 65.  When pressed further, Ms. Van Allen remained less than certain on this key point:

> Q.     If there were some criminal acts of violence in the past, you think that would help you in answering whether or not there's a probability the defendant would commit acts of criminal – criminal acts of violence?
>
> A.     *I think* if I knew that, I *probably* would be influenced.

2 RR 66.

Ultimately, like the African American jurors who were improperly excluded by the State, Ms. Van Allen said she would base her answer to Special Issue No. 2 solely on "the facts":

> A.     No, I would never automatically answer it yes.

37

Q.      Okay.  It would depend upon what the facts were?

A.      Yes.

2 RR 81-82.  Moreover, Juror Van Allen stated that she did not think she would vote to impose

the death penalty even if the State proved that the murder was "deliberately committed and it was

a heinous crime" unless she was personally convinced the defendant "would do this in the

future."  2 RR 84.  Even when pressed by defense counsel on this key point, Ms. Van Allen said

she would vote "no" on Special Issue #2 even if there was evidence "they had robbed the man

and tortured him, slow tortured him" *and* even if "the other 11 jurors back there with you believe

the State had proved beyond a reasonable doubt Special Issue No. 2."  Ms. Van Allen was

unequivocal:

Q.      In that instance how would you vote?

A.      No.

2 RR 97.  This is precisely the rationale advanced by Respondent for striking African American

prosepctive juror Lewis.  *See* State's Answer at 48.

<u>Juror Cashiola</u>

In response to questioning from the State, Ms. Cashiola stated quite clearly that

she would *not* consider a defendant's *past* conduct in assessing the likelihood of his future

dangerousness to society:

Q.      . . . . Do you feel if you knew something about the defendant's background, past
        behavior, good or bad, that that would help you in answering that Special Issue
        No. 2?

A.      Not really.  You mean, what he could have done before, is what you're saying?

.                       .                       .

38

Q.      – that might help you in kind of predicting the future?

A.      No, because you can't predict the future.

18 RR 2167.  Juror Cashiola even went so far as to say that she would hold the State to a burden

of proof that was *higher* than reasonable doubt:

Q.      If we stopped this trial right now and you were asked was Mr. Washington guilty
        or innocent, what would your verdict be?

A.      You couldn't give a verdict because you don't know anything about the case,
        nothing has been proved to you.

Q.      Okay.  And what if it had been proved to you, then what?

A.      If it hasn't been proved to *beyond a shadow of a doubt*, well, it would be
        innocent, if it wasn't proved to you.

Q.      Okay.  It's proof beyond a reasonable doubt.

A.      Okay.  That's close enough.

18 RR 2181.

Q.      After you believe someone intentionally killed somebody, based on the evidence,
        okay? – and you told me if that happened that your answer to Special Issue No. 1
        would be yes.

A.      That if *beyond any doubt* that they found guilty –

Q.      Yes, ma'am.

A.      – they committed the crime.

18 RR 2209.

Q.      . . . . Would you say that reasonable doubt means more than could have?

A.      Reasonable doubt more than could have?

Q.      Yes, ma'am.

39

A.     Depends on how the evidence went.

Q.     Okay.  But if the evidence – after all the evidence is presented the evidence shows you that the defendant could have did it?

A.     But then you go back he maybe could have not done it.

.                    .                    .

Q.     Concerning reasonable doubt is – which do you think is the closest to reasonable doubt, a certainty or a possibility?

.                    .                    .

A.     The certainty.

Q.     Ma'am?

A.     The certainty.

18 RR 2185-2186.  Concerning her opinion of a police officer's testimony, Ms. Cashiola stated, "They can lie just like we can lie."  18 RR 2189.

Based on the foregoing voir dire, it is difficult to imagine that Ms. Cashiola would have been permitted by the State to serve on Mr. Washington's jury had she been African American.

Beverly Ann Long

Ms. Long likewise indicated significant ambivalence about the death penalty, in particular, with regard to the applicability of the Special Issues:

A.     I think if you found either one of these [Special Issues] to be, you know, not completely true, that the person should get life.  I mean they shouldn't get the death penalty.  They should get life.

19 RR 2288.  Ms. Long also demonstrated a reluctance to convict based solely on the testimony of a single witness:

40

Q.      . . . . Do you feel you could convict someone based on the testimony of just one witness and that witness convinced you beyond a reasonable doubt?

A.      From one person?

Q.      Yes, ma'am.

A.      Will you take the answer, "I don't know"?

.           .           .

Q.      And oftentimes . . . there is just one witness of a crime, if any . . . , and I'm trying to see what your feeling are along those lines.

A.      Would there be other evidence, though, presented with this one witness' testimony?

Q.      There may or may not be.  It's possible.

19 RR 2298-2299.

<u>Kathleen Elizabeth Muckelroy</u>

Juror Muckelroy was accepted by the State despite her voir dire testimony that she was

inclined to hold the prosecution to a standard of proof that was higher than reasonable doubt:

A.      . . . There's too many "if's" or "maybe's" in there.  You have to have a definite showing of what it is.
Q.      Okay.  Well, sounds like – it sounds a little bit like you may be saying, though, you want proof beyond all doubt?

A.      Not completely.

.           .           .

Q.      Could you imagine a situation where you may have some little doubt about something, but still find someone guilty beyond a reasonable doubt?

A.      It would depend what it is and at that time.  *I don't know.*

5 RR 486.

41

Ted Morris Hamilton

Mr. Hamilton was accepted by the State as the alternate juror despite his expression of a

standard of proof higher than that required by law:

> Q.     Again, do you feel you could base a conviction just on the evidence an not require
>        that the State bring in the murder weapon, for example?
>
> A.     I *think* I could, *if the evidence was overwhelming beyond what I consider a
>        reasonable doubt.*

22 RR 2674.   Mr. Hamilton stated that he would need to be convinced to a near certainty that

the defendant was likely to commit violent acts in the future in order to vote "yes" on Special

Issue No. 2:

> Q.     Okay.   Now, let me move on to Special Issue No. 2 then . . . . Do you see
>        probability as being something closer to a possibility or closer to a certainty that
>        something has occurred?
>
> A.     In this type of circumstance I'd say *closer to a certainty.*
>
> Q.     Okay.  Would you go so far as to require the State to prove to a certainty that the
>        defendant would commit criminal acts of violence?
>
> A.     Well, I don't know that I – that it would have to be absolute certainty.  It certainly
>        would have to be evidence to my own mind, again, that would lead me to believe
>        that the individual is a threat and has a *high probability of continuing violent acts.*

22 RR 2677.

This is precisely the rationale posited by Respondent as a "race-neutral" reason for

striking prospective juror Willie Hernandez, Jr.  *See* Answer at 50 ("Regarding the term

'probability' in the second special issue, Hernandez testified that probability was closer to

'certainty' than 'possibility.'")

Respondent contends that African American jurors were barred by the prosecution from

serving on Mr. Washington's jury because of responses "during voir dire that could have given

the prosecutor pause."  Answer at 47.  As demonstrated by the foregoing, many of the white

jurors accepted by the State likewise gave responses that would have given the prosecutor pause.

There is only one plausible explanation for the differential treatment by the prosecutor: their

race.

(iii)    **"Demeanor" as a pretext for racial discrmination.**

Respondent seeks to justify its removal of all minority members from Mr. Washington's

jury on the basis of their demeanor, as recorded by the prosecutors' notations on the jury

questionnaires:

> For example, the prosecutor noted on venire member Lewis' questionnaire that she was "emotionless" with a "flat voice." Petitioner's Exhibit 21.  The prosecutor also made notations on Knight's questionnaire indicating that she was "uninterested during general voir dire" and had her arms folded during her individual voir dire.

 Answer at 40.

> The prosecutor made notations concerning Knight's demeanor during the jury selection process.  The notes indicate that she appeared uninterested during the general voir dire, and sat with her arms folded during individual voir dire by prosecutor Keno Henderson. Petitioner's Exhibit 21.

Answer at 45.

> The notes on Lewis' questionnaire also indicate that her demeanor during voir dire may have influenced the prosecutor's decision to strike her from the panel.  In particular, the prosecutor noted that Lewis appeared "emotionless," with a "flat voice," and that she didn't smile.  Petitioner's Exhibit 21.

Answer at 49.

Numerous courts have addressed the difficulty of assessing the validity of "demeanor" as

an asserted rationale for the peremptory removal of minority members from juries.  In the typical

43

case, the initial determination is made contemporaneously by the trial judge who, ideally, was in a position to assess whether the juror's demeanor was indeed as represented by the prosecutor making the challenge.  Here, that is impossible, and caution is even more warranted with regard to assertions of "demeanor" as a permissible ground.  Even in the typical case, courts are wary of using allegations of a juror's demeanor or body language to justify a peremptory removal because of the high potential for abuse and deception:

> Nonverbal conduct or demeanor, often elusive and always subject to interpretation, may well mask a race-based strike. For that reason, trial courts must carefully examine such rationales. Our sister court which, as we have noted, has a much more developed Batson jurisprudence than we do, *see Goode* [*v. Shoukfeh*, 943 S.W.2d 441, 450 (Tex. 1997)] has held that a prosecutor's statements that he didn't like a venireman's "attitude, his demeanor" were pretextual when his verbal answers failed to show hostility.

*Davis v. Fisk Electrical Co.*, No. 06-0162 (Tex. Sep. 26, 2008).  *See also United States v. Sherrills*, 929 F.2d 393, 395 (8th Cir.1991) (Court "concerned about the generality of such an explanation as inattentiveness for the striking of venire members. Determining who is and is not attentive requires subjective judgments that are particularly susceptible to the kind of abuse prohibited by Batson."); *Mack v. Anderson*, 861 N.E.2d 280, 297 (Ill. App. Ct. 2006) ("conduct and demeanor must be given close scrutiny because such perceptions may easily be used as a pretext for discrimination"); *Zakour v. UT Med. Group, Inc.*, 215 S.W.3d 763, 774-75 (Tenn. 2007) ( body language must be "sufficiently specific to provide a basis upon which to evaluate [its] legitimacy," and "body mechanics" was not detailed enough ground to survive Batson objection) (citation omitted); neutral explanations based on subjective assessments, such as a juror's demeanor or appearance, must be carefully scrutinized); *State v. McFadden*, 191 S.W.3d 648, 655 (Mo. 2006) ("strikes based on vague references to attributes like demeanor are largely

irrelevant to one's ability to serve as a juror and expose venirepersons to peremptory strikes for no real reason except for their race.").

For obvious reasons, it is difficult or impossible at this point in the proceedings to assess "whether the juror's demeanor can credibly be said to have exhibited the basis for the strike." *Snyder v. Louisiana*, 123 S. Ct. 1203, 1208 (2008). Indeed, it is normally the province of the trial court – when effective counsel appropriately objects to the prosecutor's tactic – to "evaluate whether the *prosecutor's demeanor* belies a discriminatory intent." *Id.* Even so, under the totality of the circumstances here, the Court should give little or no credence to vague unsubstantiated notations purporting to memorialize the subjective observations of intangible extra-record factors by a prosecutor with a history of racial discrimination.

> ### (iv)    Pattern and practice of racial discrimination by Mr. Washington's specific prosecutor and the District Attorney's Office.

As detailed in Mr. Washington's Petition, his trial prosecutor, Bob Stabe, was found to have engaged in racially discriminatory jury selection in *Whitsey v. State,* 796 S.W. 2d 707 (Tex. Crim. App. 1989). *See* Petition at 102-105. As this Court noted in its Order remanding this case to state court for consideration of the instant *Batson* claim:

> Apparently, the prosecutor regularly engaged in practice of excluding African-American prospective jurors, only allowing African-Americans to sit on the jury in two of the twenty-nine cases he had tried before 1989. See Whitsey, 796 S.W. 2d at 732 (concurring opinion on rehearing).

Order, December 7, 2001.

In addition, the Harris County District Attorney's Office has a documented history of such discrimination. *See* Petition at 116-122.

It is true, as Respondent points out, that between Whitsey's conviction on March 11, 1985, and jury selection in Mr. Washington's case in September of 1986, the Supreme Court issued its opinion in *Batson*.  Answer at 52-55.  It is not true, however, that "[t]he discriminatory practices noted in *Whitsey* are not evident in this case."  Answer at 55.

On the contrary, the same discriminatory practices are present here.  The only difference is a modicum of post-*Batson* tweaking.  The intent was the same and the result was the same.  The only thing that changed was the sophistication of the prosecutor in fashioning ostensibly "race-neutral" justifications for the exact same conduct.

Respondent also makes a somewhat convoluted argument for distinguishing *Whitsey* and for excusing the prosecutor's pre-*Batson* history of racial discrimination:

> Whatever else might be said of using the practice of using peremptory challenges to exclude minorities from the jury, it was not at the time of Whitsey's trial - illegal. Washington's jury was selected subsequent to *Batson*.  Thus, evidence cited in *Whitsey* regarding a pattern of discrimination loses relevance unless Washington can establish that Stabe continued these practices after *Batson* made it clear that they were unconstitutional and would result in a new trial.

Answer at 52.

Respondent is grabbing at straws in attempting to make Stabe's history of racial discrimination "lose relevance" here.  In the first place, discrimination is discrimination whenever it was committed – whether it was illegal or unconstitutional at the time or not. Segregation and, indeed, slavery, were "legal" for hundreds of years but were no less discriminatory or invidious before they were outlawed than after.  It is Stabe's flagrant and well-documented history of such practices that raises a strong inference of similar motivations at Mr. Washington's trial which took place very shortly after both Whitsey's trial and the issuance of

*Batson.*  Secondly, the fact that Stabe's discriminatory practices may have been technically "legal" and "constitutional" at the time of Whitsey's trial did not prevent the court in *Whitsey* from examining that historic pattern of practice, holding Stabe accountable for it and granting Whitsey a new trial.   This Court , it is respectfully submitted, should do the same here.


### A.7.    Ineffective Assistance of Counsel - Guilt/Innocence Phase.

Mr. Washington's Petition raises a claim that his trial counsel rendered ineffective assistance at the guilt/innocence phase of his trial.  In particular, trial counsel failed to present the available, credible defensive theory of a "drug deal gone bad," despite the fact that counsel was aware of that theory and supporting evidence.  Petition, at 138-182.  Compounding this error, counsel failed to adequately cross-examine State's witnesses – especially Mary Drakes and Yemane Kidane – and failed to expose the fact that Mr. Kidane waited over thirty minutes after the shooting before calling police to the crime scene. *Id*.

Respondent's Answer argues that most of this claim is unexhausted and procedurally barred, despite the fact that the same arguments were explicitly raised during state proceedings. The Answer then dismisses most of counsel's failures as minor or insignificant, failing to address the evidence supporting Mr. Washington's claims.  As demonstrated in the Petition and reiterated below, trial counsel's utter failure to present the jury with a credible defensive theory was an abdication of his role as counsel, allowing the State to obtain a conviction of Mr. Washington without having its case subjected to meaningful adversarial testing.

(a)     **Mr. Washington's Arguments that Trial Counsel Failed to Present a Viable Theory of the Defense are Not Procedurally Barred.**

In his state habeas application, Mr. Washington raised a claim of ineffective assistance of counsel, arguing that Reo Harris did not present a defensive theory at the guilt phase of the trial. *See* State Habeas Petition, at 36-37 & n.14 (second fundamental trial error committed by Harris was the failure to present an alternative theory).  In response to the state habeas allegations, Mr. Harris stated in his first affidavit that:

> Mr. Washington himself was supposed to tell the jury about a dope deal going bad, but he refuse[d] to take the stand.
> 
> ***
>
> At the time Mr. Washington['s] case went to trial and during jury voir dire I believe[d] that Mr. Washington was going to testify.  Nor did I know that Mr. Washington had written his girl friend Mary Drake a letter detailing his acts and pertisipation[sic] in the injury of one compliants [sic] and the death of the other and that Ms. Drake had turned the letter over to the prosecutor's office, I only discovered the existence of the letter shortly before Ms. Mary Drake testified
>
> ***
>
> I explain[ed] to Mr. Washington that the letter he had written Ms. Drake could be used to impeach him if he didn't testify to what the letter said and the fact that this would severely handicap my cross eximination [sic] of Ms. Drake, and that the defense of his case depended upon him testifying, he refused to testify.

September 25, 1990 Affidavit of Reo Harris (Exhibit 2 to Petition).  As the Answer acknowledges, the state habeas court addressed this claim, denying it on the ground that Mr. Washington had not produced any "relevant admissible evidence" "that Kidane and not [Washington] shot the decedent due to discord created by a bad dope deal."  *See* Answer, at 72. The state habeas petition also presented evidence that trial counsel failed to properly support the "drug deal gone bad" theory by failing to cross-examine Mr. Kidane on inconsistencies in his testimony, State Habeas Petition at 50, failing to attack his credibility, *id*., and failing to expose

48

and confront Mr. Kidane regarding his post-shooting behavior, which included his firing of his weapon, his flight to Vivian's 420 feet away, and his failure to call police from the nearest and safest telephone. *Id*. at 27-28.

Respondent makes several assertions that Mr. Washington failed to present subparts of this claim to the state courts. Respondent asserts that Mr. Washington failed to present the state court with evidence that illegal drug sales were conducted at Mike's Food Mart. Answer, at 78. To the contrary, the state petition specifically states that "*if* [Mr.] Harris had conducted a pre-trial investigation he would have uncovered evidence that Kidane and Tareh and Mike's Grocery Store were in the drug trade and operated what is known as a 'sex for groceries' operation," both undercutting Mr. Kidane's credibility and further supporting the "drug deal gone bad" defensive theory. State Habeas Petition, at 57-58 (emphasis original) (citing affidavit evidence).

Respondent also states that Mr. Washington failed to present the state court with evidence that Mr. Washington and Mr. Kidane had previous dealings with one another. Answer at 78. The Respondent ignores the fact that Mr. Washington specifically complained that he was denied discovery in order to establish that, "Kidane lied when [he] testified that Washington did not do business with the store." State Habeas Petition, at 31. Furthermore, in an affidavit attached to the State Habeas Petition, Mr. Washington testified that he had bought and sold drugs with Mr. Kidane since 1984. State Habeas Petition, at Exhibit B ¶ 41. Finally, while it is true that the claim presented in the Petition largely relies upon the Mary Drakes affidavit and the Harris Deposition, Ms. Drakes was not located by state habeas counsel due to inadequate investigative resources, which were requested but repeatedly denied by the state court. As for Mr. Harris, the state court repeatedly refused to allow Mr. Washington's counsel to depose him. *See* Pre-Petition

49

Motion for Discovery and Appointment of Expert Assistance (Exhibit 4, Tab B to Petition);

Motions Hearing (Exhibit 4, Tab D to Petition) (denying discovery); First Post-Habeas Petition

Motion for Discovery (Exhibit 4, Tab F to Petition); Post-Conviction Writ Hearing at 9 (Exhibit

8 to Petition) (denying motion for discovery).

Finally, Respondent faults Mr. Washington for failing to present to the state courts the

evidence regarding the thirty-minute delay between the shooting and the time that Mr. Kidane

called the police.  Answer, at 71.  The evidentiary support for the thirty-minute delay is

contained in documents from the police investigatory files, which Mr. Washington only obtained

during these federal proceedings.  As the record establishes, state habeas counsel repeatedly

requested the police file.  *See* Pre-Petition Motion for Discovery (Exhibit 4, Tab B to Petition), at

Schedule B ¶ 1; Post-Petition Motion for Discovery (Exhibit 4, Tab F to Petition), at Schedule A

& B.  These requests were denied.  *See* Motions Hearing (Exhibit 4, Tab D to Petition); Post-

Conviction Writ Hearing (Exhibit 8 to Petition).

> ### (i)     Mr. Washington has not "failed to develop" the factual basis of his claims pursuant to 28 U.S.C. § 2254(e)

As explained throughout, a petitioner has not "failed to develop" the basis of his claim if

the default was not due to a decision or omission by counsel.  *See McDonald*, 139 F.3d at 1059.

Mr. Washington diligently pursued the resources with which he could fully develop his claim in

state court, but his reasonable requests were denied.  State habeas counsel recognized early on

that trial counsel did not investigate Mr. Washington's case and that there were issues of

ineffective assistance of counsel and sought finds for an investigator.  *See* Pre-Petition Motion at

4 (Exhibit 4, Tab B to Petition).  Counsel noted that his requests to view the Harris County

District Attorney's file had been rejected and that he did not have the benefit any meaningful documents from trial counsel's file.  *See id.* at 3.  This request was reurged after the filing of Mr. Washington's state habeas petition.  *See* Post-Petition Motion for Discovery (Exhibit 4, Tab E to Petition).  Furthermore, Mr. Washington specifically requested a deposition of Reo Harris.  *Id*. at Tab B.

Mr. Washington's requests for investigative assistance and discovery were denied.  *See* Motions Hearing, September 26, 1989 (Exhibit 4, Tab D to Petition).  Without such assistance, Mr. Washington's pro bono counsel was unable to conduct the necessary investigation to locate witnesses such as Ms. Drakes and Ms. Smith who have now provided information in support of Mr. Washington's claims.  *See* Affidavit of Mary Drakes (Exhibit 28 to Petition), Affidavit of Carolyn Smith (Exhibit 32 to Petition).  Mr. Washington also requested an evidentiary hearing in which he could subpoena witnesses and examine them before the Court.  *See* State Habeas Petition, at 125; Motion Confirming Request for Habeas Corpus Hearing, *Ex Parte Washington*, No. 449603 (filed December 26, 1990).  Although the Court determined that there were unresolved material issues of fact concerning Mr. Washington's claims, a hearing was denied and, instead, trial counsel was ordered to file an affidavit in response to the allegations.[8]  Due to the state court's refusal to appoint compensated and trained counsel or provide investigative assistance, these witnesses were not contacted until many years after the crime.  Had Mr. Washington been provided with the resources he required when he first requested them in 1989,

---

[8] When the state habeas judge found trial counsel's affidavit unsatisfactory, trial counsel was ordered to seek assistance from the District Attorney in preparing a second affidavit.  *See* Recusal Hearing at 49 (Exhibit 5 to Petition) (Judge Lykos said that when she saw Mr. Harris she would tell him to call the DA).

*see* Pre-Petition Motion (Exhibit 4, Tab B to Petition) the information they provided would have been fresh and counsel would undoubtably have been led to other witnesses with more direct knowledge of the case.  Furthermore, Mr. Washington's state habeas proceedings were litigated without the benefit of the disclosure of any police reports or other documents from law enforcement files.  These records were not made available until open records laws took effect which compelled disclosure of non-privileged reports.  *See infra.*

Mr. Washington made numerous requests to develop the factual basis of ineffective assistance claims and was denied at every turn.[9]  He had no ability to investigate vital fact witnesses, was denied discovery, and was deprived of the opportunity to call witnesses at an evidentiary hearing.  Mr. Washington has not failed to develop the factual basis of his claims. *See McDonald,* 139 F.3d at 1059.[10]

> **(ii)     The Respondent's arguments on the merits of Mr. Washington's claim fail to offer any meaningful rejoinder to Mr. Washington's evidence.**

In response to Mr. Washington's argument that trial counsel failed to present the credible defensive theory of a "drug deal gone bad," Respondent states that Petitioner has not presented evidence that counsel could have used at trial to prove the theory.  Answer, at 76.  To the contrary, the Petition detailed an abundance of evidence:

---

[9] Mr. Washington is not required to exhaust any new facts which were not presented to the state courts because exhaustion would be futile.  *See supra* Part I(A)(2)*.*  Tex. Code Crim. Proc. Art. 11.071 § 5 creates a blanket ban on all successive applications for a writ of habeas corpus if the same claim has been raised in a prior application.  Mr. Washington's ineffective assistance of counsel claim was raised in his state habeas petition and therefore will not be considered in a successive writ.

[10] A showing that Mr. Washington has not failed to develop the basis of his claims also demonstrates that his claims are not procedurally defaulted.  *See Barrientes,* 221 F.3d at 771

Trial counsel repeatedly explained at his deposition that his strategy at the time of trial was to defend against capital murder charges by presenting evidence that the homicide of Mr. Tareh had **not** occurred during a robbery, stating, **"*That was my strategy, that no robbery occurred.*"** Exhibit 10 (Harris Deposition), at 103-04; *id*. at 73 ("I don't believe [the incident] was a robbery"). Instead, the planned defense was that the incident was a "drug deal gone bad." ***Trial counsel was aware that the shootings at Mike's Food Mart had resulted from an argument between the men over a payment Mr. Kidane owed to Mr. Washington for work performed by Mr. Washington.*** Counsel had, at the time of trial, evidence to support this defense theory. In particular, trial counsel was aware of the following:

- Although Mr. Kidane created the impression at trial that he was robbed by a relative stranger, denying having known Mr. Washington in any capacity other than as a customer and stating that he did not know Mr. Washington's name, S.F. Vol. XXVIII:463, in fact Mr. Kidane was well-acquainted with Mr. Washington. The two men had frequent illicit business dealings and, although Mr. Washington was not on Mr. Kidane's payroll, he often performed work for Mr. Kidane. Exhibit 10 (Harris Deposition), at 62-63. *See also* Exhibit 6 (Drakes Affidavit), at ¶ 5.

- Mr. Kidane and Mr. Tareh were engaged in illicit drug dealings at Mike's Food Mart, and in other "underhanded dealings" such as those which involved Mr. Washington. Exhibit 10 (Harris Deposition) at 61-62. As detailed in this section, *see infra* Part III.A.7.b , this information was easily corroborated.

- In truth, there was no robbery of Mike's Food Mart on the night of December 19th. Rather, Mr. Washington had an argument with Mr. Kidane and Mr. Tareh over payment for the work he had done for them. Exhibit 10 (Harris Deposition), at 73, 103. In particular, Mr. Washington arrived at the store to pick up money that Mr. Kidane and Mr. Tareh owed him, and the men argued and fought, and more than one gun was fired. Exhibit 10 (Harris Deposition), at 72.

- In stark contradiction to Mr. Kidane's testimony, there in fact was a struggle in the store on the night Mr. Tareh was killed, due to the argument between Mr. Washington and Mr. Kidane over money owed to Mr. Washington. Photographs from the crime scene corroborated Mr. Washington's account of the struggle. Exhibit 10 (Harris Deposition) at 72.

- Mr. Kidane delayed calling police for at least 30 minutes, despite his claim of extreme fear that his assailant would strike again and was waiting outside, and despite the fact that his employee was fatally wounded and he himself had serious

(showing of 2254(e) also demonstrates "cause").

injuries.  Trial counsel had information that, in the time before he called the police, Mr. Kidane had cleaned up the store to rid it of drugs, and had hidden a weapon.  Exhibit 10 (Harris Deposition), at 118.

Trial counsel therefore had learned that Mr. Washington and store owner Yemane Kidane had frequent contact and "underhanded dealings" with one another.  He also had learned that on the night of the December 19, the men had argued in the store over payment for some of these "underhanded dealings," and a fight ensued in which shots were fired, resulting in Mr. Tareh's death and Mr. Kidane's injury.  This defense theory was corroborated by the available physical evidence – including forensic and pathological evidence, the inaccuracies and inconsistencies in Mr. Kidane's accounts, available information about drug activity at Mike's Food Mart, and the previous dealings between Mr. Washington and Mr. Kidane.  Such a defense theory was more plausible than the State's theory that a regular customer, not known by name, robbed Mike's Food Mart of $100 and murdered Mr. Tareh in the course of the robbery.  Indeed, Mr. Kidane's odd behavior, especially in combination with the other evidence listed above, indicated that he had something to hide.  Incredibly, however, ***trial counsel presented none of this information to the jury***, despite the fact that it could have been elicited from some of the very same witnesses who testified at the trial.

Petition, at 139-141 (footnotes omitted) (emphasis original).  Clearly, the "drug deal gone bad"

defense "existed," as testified to by trial counsel nearly fifteen years later, and the Respondent's

assertion to the contrary is baseless.

Counsel, however, abandoned the defense.  He explained in his 1990 Affidavit -- and

repeatedly testified at his deposition -- that a letter allegedly sent from Mr. Washington to Mary

Drakes, and Mr. Washington's subsequent refusal to testify based upon the letter, made it

impossible to pursue his defense as planned.  *See* Petition at Part III(A)(7)(g).  Mr. Harris' failure

to provide Mr. Washington informed and competent advice regarding his decision to testify has

already been discussed at length.  Petition, at 166-174.   Respondent now asserts that Mr.

Washington was responsible for the failure of his defense because he refused to testify "despite

trial counsel's best efforts."  Answer, at 74.  Respctfully, trial counsel clearly did not put forth

his best efforts, because *he has acknowledged that he never reviewed the letter, despite the fact*

54

*that the State offered to make it available to him.*  Petition, at 168; Deposition of Reo Harris

(Exhibit 10 to Petition) (hereinafter "Harris Deposition"), at 65, 67-68.[11] As argued in the

Petition, any strategic decision made by trial counsel based on the letter could not have been

reasonable unless he had read the letter and found out what it said.  *See* Petition, at 169 (citing

*Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986); *Foster v. Lockhart*, 9 F.3d 722, 726 (8th Cir.

1993)). *See also United States v. Drones*, 218 F.3d 496, 500 (5th Cir. 2000) (strategic decision is

only reasonable to the extent it is informed through investigation); *Moore v. Johnson*, 194 F.3d at

615, *Strickland,* 466 U.S. at 690-91.  Respondent therefore suggests that trial counsel performed

competently by acquiescing to his client's uninformed strategy decisions. This argument is

foreclosed by the Supreme Court's seminal case on effective counsel, which stated:

> [A] fair trial is one in which evidence subject to adversarial testing is presented to
> an impartial tribunal for resolution of issues defined in advance of the proceeding.
> The right to counsel plays a crucial role in the adversarial system embodied in the
> Sixth Amendment, since ***access to counsel's skill and knowledge is necessary to
> accord defendants the ample opportunity to meet the case of the prosecution to
> which they are entitled***.

*Strickland*, 466 U.S. at 685 (internal citations and quotation marks omitted) (emphasis added).[12]

---

[11]   Respondent further argues that trial counsel did not need to review the actual letter,
because he "knew what the letter said because he could ask Washington himself."  Answer, at
71.  There is no indication in the record that Mr. Washington told Mr. Harris the specifics of any
such letter, or that Mr. Harris even asked him.  Indeed, Mr. Harris stated at his deposition, "I
don't know what he told her he did in the store, okay?" Harris Deposition, at 66.  *See also*
Petition, at 151-52 (citing Harris Deposition, at 112-13) (trial counsel merely accepted the advice
of Ms. Drakes that the letter would "hurt [Mr. Washington] bad" and that he should "leave it
alone").

[12]   Furthermore, the careful steps trial counsel took in attempting to avoid "opening the
door" to the admission of the letter, *see* Petition, at 154-55 (citing Harris Deposition at 70-71),
only prove his inadequate knowledge of the law.  Had the State wanted to introduce inculpatory
statements by Mr. Washington made in a letter he wrote, these would be clearly admissible as a
statement against penal interest.  *See Garcia v. State*, 960 S.W.2d 329, 333 (Tex. Ct. App. –

Also based upon the letter's unknown contents, trial counsel "went light" on Ms. Drakes, and failed to elicit crucial information on cross-examination that would have supported the defensive theory.  Harris Deposition, at 70.  Mr. Harris testified that he had prepared Ms. Drakes to testify that Mr. Washington's relationship with Kidane extended far beyond selling them things.  Mr. Harris testified that Ms. Drakes was prepared to testify from her personal knowledge that Mr. Washington,

> would do things for them, like I think she knew about Willie enforcing for them.
> She knew about stuff because she was his girlfriend.

Harris Deposition, at 113.  Mr. Harris also testified that Ms. Drakes had knowledge that Mr. Washington was "skimming off the top" in his business transactions with Kidane, thus giving greater support to the theory that the shooting was a dispute over illegal business rather than a robbery.  *See id*. at 112.  This testimony from a State's witness would have been particularly helpful in undermining Mr. Kidane's credibility and establishing doubt that the shootings were part of a robbery, as had been put forward by the State.  Furthermore, this evidence could have been introduced regardless of whether Mr. Washington testified.  Again, trial counsel's decision not to elicit this helpful testimony could not have been reasonable unless he had read the letter and found out what it said.  *See Drones*, 218 F.3d at 500; *Moore*, 194 F.3d at 615, *Strickland,* 466 U.S. at 690-91.  While Respondent argues that trial counsel effectively cross-examined Ms. Drakes by eliciting the statement that Mr. Washington "would sell them things," Answer, at

---

Corpus Christi 1997) (inculpatory letters written by the defendant to friend admitted as a hearsay exception).  The fact that the letter was never introduced by the State indicates that the letter was in fact exculpatory, or that the State never had any such letter. Trial counsel gained nothing, and ceded the entire defense, through his efforts to avoid introduction of unknown statements in the letter.

73, this isolated reference was meaningless to Mr. Washington's jury.  Trial counsel failed to

provide any necessary background or context for this statement -- in fact, even failed to have Ms.

Drakes specify who she meant by "them" -- and certainly did not establish what he knew to be

true:  that Mr. Kidane and Mr. Washington had engaged in illicit business dealings for a number

of years.

Respondent also attempts to minimize the glaring contradictions in Mr. Kidane's various

accounts of the crime, defending Mr. Harris's cross-examination as more than adequate.  This

assertion is rebutted in the Petition, at 147-156.  Respondent again attributes counsel's failures to

the fact that Mr. Washington allegedly refused to testify at the last minute.  It is not clear why

Mr. Washington's testimony would have been necessary to expose the damning inconsistencies

in Mr. Kidane's varied accounts to the police.  Indeed, the arguments in the Petition – which do

not rely on any testimony by Mr. Washington -- demonstrate that Mr. Kidane's credibility could

have been thoroughly discredited without such testimony.

Trial counsel failed to fully expose the glaring contradictions in the accounts of Mr.

Kidane, the State's star witness; failed to extract from available State witnesses such as Mr.

Kidane and Ms. Drakes evidence that supported the alternate theory of a "drug deal gone bad";

and failed to highlight or even mention the glaring contradictions in the ballistics and

pathological evidence, as discussed in the following section.  These failures by counsel resulted

in an abdication of his role in the adversarial judicial system, and allowed the State to obtain a

capital murder conviction without having its evidence put to any meaningful challenge.

       **(b)**       **The Answer's arguments regarding trial counsel's failure to obtain independent expert assistance are conclusory and fail to address the conflicting and seemingly irreconcilable evidence in the current record.**

In his Petition, Mr. Washington argues that trial counsel rendered ineffective assistance because he failed to obtain independent expert evaluation of the forensic and pathological evidence in Mr. Washington's case.  In particular, trial counsel failed to obtain expert evaluation of the obvious discrepancies between the small size of the wounds suffered by Mr. Kidane and Mr. Tareh and the State's theory that Mr. Washington had inflicted those wounds with a .38/.357 caliber weapon.  *See* Petition, Part III(A)(7)(f) at 161 *et seq*.  As stated therein, there were strong indications -- most importantly the size of Mr. Tareh's wound as measured at his autopsy -- that the State's theory was flawed.  Police officers at the crime scene uniformly concluded that Mr. Tareh had been fatally wounded by a small caliber weapon.  When police arrived on the scene, Mr. Kidane was in possession of a small caliber weapon – specifically,  a .25 caliber weapon.  Mr. Kidane admitted at trial that he had fired his weapon two times, although he had not given police this information during his initial interviews.

An expert in pathology who reviewed the evidence during these proceedings concluded that, while it would be unusual for Mr. Tareh's wounds to have been inflicted with a .38/.357 caliber weapon, the wound size is typical for one inflicted by a .25 caliber weapon such as the one in Mr. Kidane's possession.  However, subsequent independent testing authorized by this Court has concluded that the bullets entered into evidence in Mr. Washington's case were of the .38/.357 caliber class.  Therefore, the evidence of the bullets' caliber conflicts with the pathological evidence.  The conflict is seemingly irreconcilable, and cannot be resolved on this

58

record.  Trial counsel's failure to explore and exploit this inconsistency at trial, when the evidence was fresh and available, was highly prejudicial to Mr. Washington.  Had counsel done so, it would have struck a severe blow to the State's theory that Mr. Washington was the sole shooter and had a .38/.357 caliber weapon.  It also would have supported the available defensive theory of a "drug deal gone bad."  Instead, the State's theory went unchallenged at trial and, indeed, trial counsel failed to even so much as mention the issue of wound size.

Respondent's presents argument boils down to a recitation of other evidence in the record that seems irreconcilable with that of Mr. Washington's experts.  This is precisely the point.  It was trial counsel's duty to investigate this information, seeking expert assistance where necessary, and trial counsel utterly failed to do so.  Because this claim is raised as ineffective assistance of counsel, the appropriate inquiry is set by *Strickland*:  Was counsel's performance deficient, and was the deficiency prejudicial to the defense?  The inquiry is not, as the Respondent appears to suggest, settled by the observation that the evidence in the record is in conflict.  Rather, such observation only serves to highlight trial counsel's ineffectiveness.  His failure to secure expert evaluation of obvious flaws in the State's evidence forfeited the opportunity not only to expose the weaknesses in the State's case – thus establishing reasonable doubt – but also to further advance the available defensive theory of a drug deal gone bad.  Because there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland*, 466 U.S. at 694, Mr. Washington is entitled to habeas relief.

**8.     Ineffective Performance - Punishment Phase**

    **(a)     Mr. Washington Presented the Claim that
Trial Counsel Was Ineffective for Failing
to Present Mitigating Evidence in His
State Habeas Application**

The Respondent asserts that Mr. Washington has not exhausted his claim of ineffective

assistance for failing to investigate and present mitigating evidence.  Answer, at 97.  This is

simply incorrect.  In the section of Mr. Washington's state habeas application entitled

"Sentencing Phase – Ineffectiveness," he states that:

> [t]here was mitigation available.  The only evidence Harris put on concerned the
> rough conditions in the Fifth Ward and that Washington was married and had
> been abused by jail guards . . . Other mitigation evidence existed, if only Harris
> had prepared.

State Habeas Petition at 61.  In its discussion of the omitted mitigation, the state habeas petition

cites to the section devoted to a *Penry* claim which relates possible mitigating evidence which

could have been presented.  *Id.* at 98-99.  The Petition gave examples, based upon Mr.

Washington's Affidavit, of available mitigating evidence such as childhood abuse, difficulties at

school, and drug usage.  *Id.*  It is clear from a reading of the Petition and Mr. Washington's

Affidavit that Mr. Washington's family life would have been explored at an evidentiary hearing

on his claim of ineffective assistance of counsel, had such a hearing been granted.

    **(b)     An Evidentiary Hearing is Appropriate on Mr.
Washington's Claim of Ineffective Assistance of
Counsel for Failing to Investigate and Present
Mitigating Evidence**

An evidentiary hearing is appropriate in Mr. Washington's case because he has not

"failed to develop" the factual basis of his claims in state habeas corpus proceedings and he has

60

presented facts which, if proven, would entitle him to relief.  *See* 28 U.S.C. § 2254(e); *Clark v. Johnson,* 202 F.3d 760, 765 (5th Cir. 2000).

> **(i)     Mr. Washington has not "failed to develop" the factual basis of his claim.**

Throughout his state habeas proceedings, Mr. Washington sought the resources necessary in order to develop his claims of ineffective assistance at the sentencing phase. Mr. Washington requested the assistance of an investigator prior to filing his application for a writ of habeas corpus.  *See* Pre-Petition Motion (Exhibit 4, Tab B to Petition).  Counsel for Mr. Washington argued in support of this motion that trial counsel provided no meaningful file from the representation, and that he had failed to interview witnesses or to conduct an independent investigation of the facts.  *See id*. at 5.  Because of the total absence of an investigation at trial, state habeas counsel explained that "a post conviction investigation that is required under these particular circumstances is a complete investigation of the facts, as if the case had not yet been tried."  *Id*.

In spite of the state habeas court's refusal to provide investigative assistance, Mr. Washington pled in his state habeas petition that trial counsel was ineffective for failing to investigate and present mitigating evidence.  *See* State Habeas Petition at 61.  He then requested "an evidentiary hearing at which proof may be offered as to the allegations of this petition." *Id*. at 125. In a separate motion counsel for Mr. Washington reurged his request for an evidentiary hearing explaining that, "[w]ithout limiting the grounds for an evidentiary hearing . . . a finder of fact can not decide the issues of disputed material fact based only on those selected allegations of fact that the State has chosen to attach to its Answer or file with the Court." *Ex parte*

*Washington*, No 449,603, Motion Confirming Request for Habeas Corpus Hearing at 2 (filed

December 26th 1990).  His requests for discovery and investigative assistance were also reurged

citing the claims set forth in Mr. Washington's petition.  *See* Post-Petition Motion for

Appointment of Counsel and Expert Assistance (Exhibit 4, Tab E to Petition); Post-Petition

Motion for Discovery (Exhibit, Tab F to Petition).

The pleadings in Mr. Washington's state habeas corpus proceeding demonstrate that Mr.

Washington has not failed to develop the factual basis of his claims.  *See* 28 U.S.C. § 2254(e)(2).

He requested assistance in order to conduct basic investigation of his claims of ineffective

assistance of counsel.  *See* Pre -Petition Motion (Exhibit 4, Tab B to Petition).  When the

necessary resources were denied him, he nevertheless was able to develop and plead the basic

facts relating to trial counsel's failure to investigate and present mitigating evidence.  In his 1990

petition habeas counsel presented, through the affidavit of Mr. Washington, a sketch of Mr.

Washington's broken childhood as well as the deterioration of his life preceding the crime.  *See*

State Habeas Petition, Exhibit B (Affidavit of Willie Terion Washington).  Subsequently,

counsel reurged his requests for investigative assistance and an evidentiary hearing in order to

fully develop his claims.  *See* Post-Petition Motion for Appointment of Counsel and Expert

Assistance (Exhibit 4, Tab E to Petition).  These requests were ignored for years and then

summarily denied.  *See* Post Conviction Writ Hearing, September 9, 1997 (Exhibit 8 to Petition).

The showing of available mitigating evidence that is made in Mr. Washington's Petition is based

largely on extensive interviews conducted with Mr. Washington's family members.[13]  Such an

---

[13] Although undersigned counsel was not assisted by an investigator, the majority of the
social history investigation was conducted by Bryce Benjet, who possesses years of experience

investigation was beyond the resources and training of state habeas counsel, a Beaumont

bankruptcy lawyer who was representing Mr. Washington without compensation.[14]

A habeas petitioner can only be held to have failed to develop the factual basis of his

claim if the failure was due to his own decision or omission.  *McDonald v. Johnson,* 139 F.3d

1056, 1059 (5th Cir. 1998) (petitioner did not fail to develop factual basis of claim because state

court denied evidentiary hearing).  Mr. Washington clearly requested the resources in his state

habeas corpus proceedings with which to develop his sentencing phase ineffective assistance of

counsel claims.  These requests were denied and, therefore, the absence of factual development

can not be attributed to a decision or omission by Mr. Washington.  *See Clark,* 202 F.3d at 765

(petitioner did not "fail to develop" when requests for investigative and expert assistance,

discovery, evidentiary hearing, and continuance were denied).

---

in developing mitigation evidence in capital cases.  This investigation was a time-consuming
process which required repeated interviews over the course of several months in order to develop
a trusting relationship with Mr. Washington's family members and obtain truthful and candid
information.

[14] State habeas counsel, Gary Reger, expended a great amount of time and resources in
the representation of Mr. Washington.  Even prior to filing Mr. Washington's state habeas corpus
application, he had expended 160 hours.  *See* Affidavit of Gary Reger (Exhibit 4, Tab C to
Petition).  Although many investigative tasks can be accomplished by trained counsel, an
uncompensated lawyer in a state habeas corpus proceeding is not charged with conducting
endless pro bono investigation when the courts repeatedly deny counsel any resources.
Diligence is satisfied when counsel recognizes the need for investigative assistance and properly
requests it from the Court.  State habeas counsel did so through his various motions for
investigative assistance and through his requests for the appointment of an attorney trained in the
criminal law.  *See* Petition Exhibit 4 at Tabs B, C, D, E, F, and H (motions for discovery, expert
assistance, and appointment of counsel).

**(c)      An Evidentiary Hearing is Appropriate Because Mr. Washington Has Presented Factual Allegations Which, if Proven True, Entitle Him to Relief**

The determination of whether an evidentiary hearing is appropriate rests on a determination of the merits of Mr. Washington's claim for relief because of the ineffective assistance of counsel at the sentencing phase of his trial.  The merits of this claim are fully briefed in the Petition, so the arguments in this Reply will be addressed to those points raised by the Respondent's Answer.

The Respondent argues that trial counsel's failure to present meaningful mitigating evidence was the result of a strategic decision by trial counsel.  Answer, at 100. This argument is completely without support in the record.  Despite two affidavits and a deposition, the Respondent does not cite to any statement by Mr. Harris that his strategy was to limit the presentation of mitigating evidence in order to prevent the use of double-edged information by the State.  Trial counsel's failure to present mitigating evidence can only be due to his demonstrated failure to investigate Mr. Washington's background, as well as his complete lack of understanding of how to conduct a capital murder defense.  *See Valdez v. Johnson*, 93 F.Supp.2d 769, 780-81 (S.D. Tex. 1999) (mitigation investigation is basic duty of trial counsel in capital case).

Although Mr. Harris stated that he was familiar with Mr. Washington and his family, *see* Harris Deposition, at 99 and April 25, 1991 Affidavit of Reo Harris at ¶ 4 (Exhibit 3 to Petition), he stated that Mr. Washington was not a drug user.  Harris Deposition, at 115; April 25, 1991 Affidavit of Reo Harris at ¶ 11 (Exhibit 3 to Petition). In fact, Mr. Washington had been addicted

64

to drugs for a considerable period of time prior to Mr. Harris' representation of him in his capital murder trial.  This was a fact well-known by all of his family members.  *See* Petition, at 182-83; Affidavit of Pearl Washington at ¶ 15 (Exhibit 56 to Petition); Affidavit of Rose Washington at ¶ 10 (Exhibit 60 to Petition).  Furthermore, Mr. Harris' contact with Mr. Washington's family was too limited for him to have actually learned anything about Mr. Washington's background.  Mr. Washington's mother recounted her contact with Mr. Harris in her affidavit:

> Reo Harris hardly talked to us at all about the trial.  We went to his office on one occasion for an appointment.  We talked for a short time and the[n] Reo said he had to leave because he had something else to do.  We ran after him to talk to him.  All he told us was that we were going to be witnesses and we couldn't go into the courtroom.  He didn't ask us anything about Terry's background or upbringing.

Affidavit of Pearl Washington ¶ 18 (Exhibit 56 to Petition); *see also* Affidavit of Rose Washington at ¶ 14 (Exhibit 60 to Petition); Affidavit of Mary Nell Washington at ¶11 (Exhibit 61 to Second Amended Petition).

Given counsel's inadequate performance at every stage of Mr. Washington's trial, as demonstrated throughout the Petition and this Reply, it is unlikely that Mr. Harris knew to present what little he did know about Mr. Washington as mitigating evidence.

> Generally, any lawyer who tries capital murder cases knows that he or she "has a duty to investigate the client's life history, and emotional and psychological make-up" through an "inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology, and present feelings."  Gary Goodpaster, *The* Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U. L.Rev. 299, 320, 323-24 (1983).  Since the acquisition of mitigation evidence is so critical in any capital case, preparation for the sentencing phase must begin when counsel is first appointed.

*Valdez*, 93 F.Supp.2d at 780-81.  Interviews with Mr. Washington's family, as well as Mr.

Harris' own testimony, reveal that he did not conduct the investigation required in a capital case to determine if there was any mitigating evidence. *See Valdez*, 93 F.Supp.2d at 781 (despite calling four mitigation witnesses, counsel was ineffective who did not visit family members at their homes and did not question them about the defendant's background).   Furthermore, the Respondent's baseless speculation that the failure to present mitigating evidence was strategy has been criticized by the Fifth Circuit:

> the Court is, therefore, not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all.

*Moore v. Johnson*, 193 F.3d 586, 604 (5th Cir. 1999).

*Lockett v. Anderson*, 230 F.3d 695 (5th Cir. 2000), is instructive on this point.  *Lockett* involved the brutal murder of a married couple in which the wife was taken captive, the husband was then murdered, and the wife was forced to strip her husband of his wallet and then later executed.  *Id*. at 698.  In habeas proceedings, Lockett, like Mr. Washington, complained that the only mitigating evidence presented at trial was the testimony of his mother.  *See id*. at 716 n.38. Lockett presented to the habeas court additional mitigating evidence which trial counsel had not investigated.  *See id*. at 714.  Although the Court recognized that some of the evidence was "double edged," it held that the failure to investigate and present the additional mitigating evidence amounted to ineffective assistance of counsel:

> We just cannot say with any degree of confidence that an objectively reasonable juror, confronted with this mitigating evidence, might not have reached the conclusion that Lockett lacked the requisite level of culpability to be punished with death. We are aware, however, that some of this evidence could have harmed Lockett. We are also cognizant of the inherent unforgivable viciousness of this murder, the nature of which may well have inflamed the jury and led them to

> reject this evidence as rendering him less culpable. But the fact that counsel did
> not even investigate this mitigating evidence, combined with the general lack of
> any mitigating evidence before the jury, denied Lockett any opportunity,
> vouchsafed by the law, to avoid the death penalty.

*Id*. at 716.   The holding in *Lockett* recognizes the guidance given by the United States Supreme

Court in *Williams* that mitigating evidence is a vital part of a capital case and that the harm from

the failure to investigate cannot be easily discounted.

Under *Strickland*, the courts must determine whether counsel's errors and omissions were

unreasonable, and "whether there is a reasonable probability that, absent the errors, the sentencer

– including an appellate court . . . would have concluded that the balancing of aggravating and

mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695, 104 S.Ct. at 2069.

When "the result of the particular proceeding is unreliable because of a breakdown in the

adversarial process that our system counts on to produce just results," this Court's "confidence is

undermined." *Strickland*, 466 U.S. at 696, 104 S.Ct. at 2069.

The state courts' analysis of *Strickland* is clearly an "unreasonable application" of the

Supreme Court's controlling precedents. *First*, to determine prejudice from the unreasonable

failure to investigate and present mitigating evidence, the Court will "reweigh the evidence in

aggravation against the *totality* of available mitigating evidence." *Wiggins v. Smith*, 123 S.Ct

2357, 2542 (2003)(emphasis added);  *see also Williams v. Taylor,* 529 U.S. 362; 120 S.Ct at

1495 (court is required to conduct an "assessment of the totality of the omitted evidence" and

then to "evaluate the totality of the available mitigation evidence–*both* that adduced at trial, *and*

the evidence adduced in the habeas proceeding")( (emphasis added).  If "the available mitigating

evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [the defendant's]

67

moral culpability," *Wiggins, supra*, 123 S.Ct. at 2544 (quoting *Williams*, 102 S.Ct. at 1495), then prejudice has been shown.  *Second*, Petitioner need only show that the available mitigation creates "a reasonable probability that at least **one juror** would have struck a different balance." *Id*. (emphasis added).  *Third*, every defendant has "a right–indeed a constitutionally protected right–to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer," *Williams,* supra. 120 S.Ct. at 1513, regardless of the strength of the state's case, the heinous nature of the offense, or the severity of the aggravators.  *Williams, supra*, 120 S.Ct. at 1515.  *Fourth*, for a fact to be mitigating it does not have to be relevant to the crime–any of "the diverse frailties of humankind," *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976), which might counsel in favor of a sentence less than death, *Lockett v. Ohio*, 438 U.S. 586 (1978), are mitigating.  *Williams, supra*, 120 S.Ct at 1495.  The lower court's prejudice analysis violated each of these fundamental rules.  *See also Wiggins v. Smith,*  539 U.S. 510, 123 S. Ct. 2527, 2537- 2543 (2003) ("counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources. . . Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a difference balance."); *Rompilla v. Beard,* 545 U.S. 374, 125 S. Ct. 2456 (2005).

In *Rompilla,* the Supreme Court reiterated its admonitions in *Williams* and *Wiggins* with regard to the duty of defense counsel, capital counsel in particular, to abide by "professional norms" as set forth in guidelines promulgated by the American Bar Association.  Although more recent editions of the ABA standards, issued in 1989 and in 2003, have refined and expanded capital counsel's duties, the performance of Mr. Washington's counsel was governed by the

standards that were in place at that time, the 1982 version.  These standards were likewise

applicable in the case of Mr. Rompilla, as the Supreme Court explained :

> As the District Court points out, the American Bar Association Standards for Criminal Justice in circulation at the time of Rompilla's trial describes the obligation in terms no one could misunderstand in the circumstances of a case like this one:
>
>> "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.  The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities.  The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty." 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.).

*Rompilla*, 545 U.S. at 387, 125 S.Ct . at 2465-66

The Supreme Court has found counsel ineffective – even where numerous witnesses were

presented at the penalty phase – where counsel unreasonably overlooked or ignored  *additional*

*mitigating evidence* that could have made a difference.  In *Williams v. Taylor,* 529 U. S. 362, 120

S. Ct. 1495 (2000), trial counsel presented four witnesses at the penalty phase: the defendant's

mother, two neighbors and psychiatric testimony.  The Court determined that trial counsel, in

failing to uncover and present *additional mitigating evidence* of Williams' difficult childhood

and borderline mental retardation, "did not fulfill their obligation to conduct a thorough

investigation of the defendant's background."  *Williams,* 529 U.S. at 396, 120 S. Ct. at 1515.

The Court emphasized the requirement that post conviction courts "evaluate the totality of the

available mitigation evidence -- both that adduced at trial, and the evidence adduced in the

habeas proceeding -- in reweighing it against the evidence in aggravation."  *Williams,* 529 U. S.

at 397-98, 120 S. Ct. 1515.  After doing so, the Court found that the entire postconviction record,

viewed as a whole and cumulative of mitigation evidence presented originally raised "a reasonable probability that the result of the sentencing proceeding would have been different" if competent counsel had presented and explained the significance of all the available evidence. *Id.*, 529 U.S. at 399; 120 S. Ct. at 1516, quoting *Strickland*.  In *Williams*, the Supreme Court held that "errors that undermine confidence in the fundamental fairness of the state adjudication certainly justify the issuance of the federal writ. (Citations omitted.) The deprivation of the right to the effective assistance of counsel recognized in *Strickland* is such an error.  *Strickland*, 466 U.S. at 686-697-98."  *Williams v. Taylor*, 529 U.S. at 375, 120 S. Ct. at 1503-1504."  529 U.S. at 375, 120 S.Ct. at 1503. Clearly, Mr.Washington "had a right – indeed, a constitutionally protected right – to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer."  *Williams,* 529 U.S. at 391, 392, 120 S.Ct. at 1512, 1513. *See also Skipper v. South Carolina,* 476 U.S. 1 (1986), and many other decisions that  require a capital sentencer to consider *all* available mitigation, *e.g., Lockett v. Ohio,* 438 U.S.  586 (1978); *Eddings v. Oklahoma,* 455 U.S. 104 (1982); *Hitchcock v. Dugger*, 481 U.S. 393 (1987).

Had Mr. Washington's jury been presented with the full story of his life, there is certainly "a reasonable probability that at least one juror" would have voted to spare him. *Wiggins v. Smith,*  539 U.S. 510, 123 S. Ct. 2527, 2537- 2543 (2003).  "Although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test." *Rompilla*, 545 U.S. at 393, 125 S.Ct. at 2469.  Rather, the question is whether "the likelihood of a different result if the [undiscovered, unutilized] evidence had gone in is 'sufficient to undermine confidence in the outcome' actually reached at sentencing."  *Id.*, quoting *Strickland,* 466 U.S., at 694, 80 L. Ed. 2d 674, 104 S. Ct. 2052.

70

(d)     **The State Habeas Court's Findings Are an Unreasonable Determination of the Facts**

The state court findings regarding Mr. Washington's claim that trial counsel was ineffective for failing to investigate and present mitigating evidence state:

> [t]he Court finds, notwithstanding the mitigating value of the "evidence" contained in applicant's affidavit, that based on the credible assertions contained in the affidavit of Reo Harris, trial counsel, who had personally known the applicant and his family for some time prior to the instant offense, was not aware or made aware that the applicant was allegedly abused by his parents in childhood and the principle in eighth grade beat him so he dropped out of school, that the applicant allegedly used to suffer blackouts and had a death wish when he was young. The Court finds that trial counsel, through his established relationship with the applicant and his family and numerous interviews with family members, exercised a reasonably diligent investigation into the applicant's background.

Findings of Fact and Conclusions of Law at 11-12 (Exhibit 9 to Petition).[15]  This determination of the facts is inherently unreasonable, as evidenced by the *ex parte* contact between the judge and the district attorney, the inconsistent affidavits of trial counsel, the denial of investigative assistance, and the lack of review of the findings by the judge who ultimately adopted the findings.  *See supra* at pp. 8-9 (bulleted list).  This alone provides grounds for an independent review by this Court.

Furthermore, the findings are unreasonable on their face.  First and foremost, the state habeas judge made a credibility determination between the affidavit of Mr. Washington and the affidavit of Mr. Harris without the benefit of an evidentiary hearing or having presided over any part of the trial, or even the previous habeas proceedings.  *See Nethery v. Collins*, 993 F.2d 1154, 1157 n.8 (5th Cir. 1993) ("paper hearing" not entitled to deference if habeas judge did not preside

---

[15] The presence of a state court finding denying Mr. Washington's claim that trial counsel was ineffective for failing to present mitigating evidence makes the Respondent's assertion that

over the trial).  Furthermore, the findings are inconsistent with the record before this Court.

Although the state habeas court found that Mr. Harris was familiar with the family and met

numerous times, the record now demonstrates that he did not know of Mr. Washington's

debilitating drug usage and had not met with Mr. Washington's two closest sisters.  *See* Affidavit

of Pearl Washington at ¶ 15, 18 (Exhibit  56 to Petition); Affidavit of Rose Washington at ¶ 10,

14 (Exhibit 60 to Petition); Affidavit of Mat Nell Washington at  ¶11 (Exhibit 61 to Petition).

The state court findings are unreasonable because they are inconsistent with the record now

before the Court and are primarily based upon Mr. Harris' inconsistent and contradicted

affidavits.[16]

### (e)  Trial Counsel Failed to Cross Examine Allen Belcher Regarding Records from Mr. Washington's Juvenile Commitment at the Gatesville School for Boys

The Respondent asserts that trial counsel's failure to introduce records from the

Gatesville School for Boys was not deficient and prejudicial because Mr. Belcher, Mr.

Washington's former caseworker from Gatesville, was adequately cross-examined regarding Mr.

Washington's "escape."  Answer, at 122.  The Respondent, however, fails to recognize that the

value of the records was not only to impeach or explain the escape, but to introduce valuable

mitigating evidence which documented both Mr. Washington's good behavior and adaptability to

the structured Gatesville environment, as well as the chaotic family life which resulted in his

placement there to begin with.  *See* Petition, at 191-196.

---

Mr. Washington did not raise the claim, *see* Answer, at 73, even more incredible.

[16] If this Court applies 28 U.S.C. § 2254(e)(1) to the state court findings rather than §2254(d)(2), the presumption of correctness has been rebutted by the trial court's failure to conduct a hearing, *see Nethery v. Collins*, 993 F.2d at 1157, as well as the irregularities in the

The Gatesville records were a fertile source of independent and credible information regarding Mr. Washington's childhood and his adaptability to confinement.  *See id.*  In *Valdez,* 93 F.Supp. at 782-83, the United States District Court for the Southern District of Texas found trial counsel ineffective for failing to conduct a minimal investigation of mitigating evidence. The Court specifically focused on school records, a basic source of this information.  *Id.  See also (Terry) Williams v. Taylor*, 529 U.S. 364, 395 (2000) (trial counsel ineffective for failing to investigate client's juvenile records).

Furthermore, trial counsel's failure to introduce these records was admittedly not a strategic decision.  Trial counsel was asked about his investigation of Mr. Washington's records in his deposition:

> Q.   Okay, Did you obtain Mr. Washington's record from his stay at the Gatesville Center in preparation for the punishment phase of the trial?
>
> A.   I don't think so, but – I did have some of – I did have some of it, but I don't think I –
>
> Q.   Okay.
>
> A.   Did I file a subpoena for it?  No, I didn't.  I didn't.
>
> Q.   Did you obtain medical or – records of medical or psychiatric records other than the Gatesville Center records?
>
> A.   No.
>
> Q.   Did you obtain records of social service agencies who had dealings with the household of Pearl and Booker T. Washington?
>
> A.   No.
>
> Q.   Did you obtain Mr. Washington's school records from –

evidence and process presented herein.  *See* Petition, at Part II(A).

A.     No.

Harris Deposition, at 82-83.  Mr. Harris did not even seek out these records.  Even though he

may have been shown some of Mr. Washington's Gatesville records in his partial review of the

State's file prior to trial, he certainly didn't recognize his basic duty to investigate his client's

background.  In light of trial counsel's utter failure to investigate any documentation of Mr.

Washington's past, the failure to present information contained in Mr. Washington's records was

hardly a decision at all – much less a strategic one.  *See United States v. Drones*, 218 F.3d 496,

500 (5th Cir. 2000) ("strategic choices made after less than complete investigation are reasonable

precisely to the extent that reasonable professional judgments support the limitations on

investigation.") (citing *Strickland*).  It was certainly not reasonable for trial counsel to have

limited his investigation of Mr. Washington's background when the primary thrust of what little

mitigating evidence he presented dealt with the rough atmosphere of Houston's Fifth Ward,

where Mr. Washington was raised.  *See* S.F. Vol. XXXIII: 491.

The prejudice resulting from trial counsel's failure to introduce the records of Mr.

Washington's commitment at Gatesville has been discussed at length.  *See* Petition, at 191-196.

Confidence in the jury's sentence can not remain in light of the paucity of mitigating evidence

presented at trial and the fact that much of the State's case in aggravation would have been

discredited but for the State's illegal suppression of exculpatory evidence.  *See Strickland*, 466

U.S. at 695 (when considering prejudice, the Court must "consider the totality of the evidence

before the judge or jury. Some of the factual findings will have been unaffected by the errors,

and factual findings that were affected will have been affected in different ways. Some errors

74

will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.").

> **(f)** **The cumulative effect of trial counsel's ineffectiveness at *both* the guilt-innocence phase *and* the punishment phase requires that Mr. Washington's death sentence be vacated.**

It is crucial to emphasize that trial counsel's ineffective assistance at the *guilt-innocence* phase contributed significantly to the jury's consideration at the punishment phase.  For example, had counsel planted doubt, as effective counsel could and would have, about the circumstances of the shooting and Mr. Washington's relationship with the victims, there is a strong probability the jury would have found Mr. Washington less culpable for punishment purposes.  Combining all of counsel's unreasonable errors and omissions at the punishment phase with his errors at the guilt-innocence phase, this Court simply can not have the confidence in Mr. Washington's sentencing to death that *Strickland* and its progeny demand.   Accordingly, penalty relief is required.

> **B.** **THE STATE DEPRIVED MR. WASHINGTON OF DUE PROCESS OF LAW WHEN IT WITHHELD MATERIAL EVIDENCE IN VIOLATION OF *BRADY V. MARYLAND* AND KNOWINGLY ALLOWED FALSE TESTIMONY TO BE PRESENTED TO THE JURY IN VIOLATION OF *GIGLIO V. UNITED STATES* AND *NAPUE V. ILLINOIS*.**

<u>**Introduction.**</u>

As set out in the Petition at 212-238, the State unlawfully withheld from Mr. Washington crucial impeachment evidence and knowingly allowed untruthful testimony from its witnesses. Contrary to the thrust of Respondent's Answer to the Petition, the impeachment evidence was highly material and would probably have changed the outcome of Mr. Washington's sentencing

proceeding had it been available to his defense.

This claim is fully exhausted in state court pursuant to this Court's Order of December 7, 2001, which permitted Mr. Washington to return to state court and present his allegations in support thereof.  Although Mr. Washington was not provided the opportunity to present his evidence at a hearing, the state courts nonetheless reviewed the claim and denied it on the merits.

Respondent and the state courts greatly minimize the importance of impeachment evidence and the significance of Supreme Court law that condemns and forbids its suppression. In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."  *Id*. at 87, and irrespective of how and whether such material was requested.  *United States v. Bagley*, 473 U.S. 667, 682 (1985).  Of critical importance here, the Court has rejected any distinction between impeachment and exculpatory evidence for purposes of *Brady* analysis.  *Id*. at 677; *Giglio v. United States*, 405 U.S. 150, 154 (1972).  Likewise, the same principles apply to evidence bearing on punishment as well as guilt. *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  *See Kyles v. Whitley*, 115 S.Ct. 1555, 1565 (1995); *United States v. Bagley*, 473 U.S. 667, 683 (1985); *Blackmon v. Scott*, 22 F.3d 560, 564 (5th Cir), *cert. denied*, 513 U.S. 1060 (1994); *Ex parte Adams*, 768 S.W.2d 281, 290 (Tex. Crim. App. 1989).  Further discussion of these hallowed legal precepts is presented in the Petition at 212-215.

1.      **Ella Miller.**

The State failed to disclose the fact that key punishment phase witness Ella Miller had

three prior convictions for theft and a prior conviction for shooting a five-year old girl to death.

Respondent argues that these convictions were either too remote in time or were otherwise

immaterial because (a) Miller's testimony was "not paramount to the State's case on punishment,

Answer at 108; (b) her testimony was "independently corroborated," *id.*; (c) "the state's case

rested on the significant number of violent incidents and other crimes attributable to

Washington," *id.*; and (d) Miller's "credibility ha[d] already been shown to be questionable."

Answer at 113.

Each of these arguments is plainly absurd and the state court findings written by

Respondent and literally rubber-stamped verbatim by the state courts should be rejected.

(a)      **Remoteness in time.**

Respondent asserts that the Court can only consider, for *Brady* purposes, Miller's three

theft convictions contending that the murder conviction would have been inadmissible due to the

fact that it was more than ten years old.  Answer at 106.  Respondent quotes from the state court

Findings of Fact written and submitted by Respondent and rubber-stamped:

> [E]vidence of a witnesses' prior conviction was not admissible if more than ten years
> elapsed since the date of conviction or the release of a witness from confinement for that
> conviction, whichever was later, "unless the court determines, in the interests of justice,
> that the probative value of the conviction . . . outweighs its prejudicial effect." Tex. R.
> Crim. Evid. 609 (b). . .
>
>  . . . [b]ased on the evidence elicited during [Washington's] trial, the probative value of
> the 1961 conviction does not substantially outweigh its prejudicial effect.

SHR2 623-24.

It is difficult to fathom what "prejudice" would come, and to whom, of allowing Mr. Washington's jury to know that witness Miller was a convicted murderer.  As pointed out in the Petition, the purpose of the "remoteness" rule that allows a court, at its discretion, to keep out an ancient conviction, is to prevent rehabilitated wrongdoers from the embarrassment of a past that is no longer relevant to their character or credibility.  The general rule is subject to exception when the witness has failed to reform her character by the time she testifies or has more recent convictions that "revitalize" the use of the older prior.  *See Wilcott v. State,* No.06-01-00108 (6th App. District of Texas, April 26, 2002) (unpublished)("exception where, in light of the particular facts of the case and especially regarding the witness's subsequent conduct, there was evidence showing a lack of reformation, including evidence of a subsequent felony conviction or misdemeanor conviction involving moral turpitude. . . .This evidence of the witness's lack of reformation reduced the prejudice from the evidence of the remote conviction."), citing *Lucas v. State*, 791 S.W.2d 35, 51 (Tex. Crim. App. 1989); *McClendon v. State*, 509 S.W.2d 851, 855 (Tex. Crim. App. 1974) (op. on reh'g); *Crisp v. State*, 470 S.W.2d 58, 59 (Tex. Crim. App. 1971). *See Oates v. State*, 67 Tex. Crim. 488, 149 S.W. 1194, 1195-97 (1912)") ((available at http://www.6thcoa.courts.state.tx.us/opinions/htmlopinion.asp?OpinionId=6087); see also *Husting v. State,* 709 S.W. 2d 121, 125-126 (Tex. App. - San Antonio 1999).

Obviously, in the case of Ms. Miller, a career criminal with no semblance of reform, this purpose was in no way applicable.  She had *three* theft convictions in a four-year period before testifying against Mr. Washington, two of then within two years of his trial.  Ms. Miller's reputation as an upstanding citizen was hardly at stake.  The state courts found that the "prejudice"outweighed the probative value in determining whether Mr. Washington would be

*executed,* but they failed to identify who would be prejudiced or how.  Such findings are

unreasonable, unsupportable and clearly wrong.

### (b)      The paramount importance of Miller's testimony.

Miller's testimony was indeed paramount, contrary to Respondent's denial. Answer at

108.  Indeed, in his Answer, Respondent describes her testimony as follows:

> Miller testified that she was brutally raped by Washington after encountering him one
> day while walking in her neighborhood. . . . Washington took her to an abandoned
> building, then robbed and raped her at knife point.

Answer at 104.  Elsewhere, Respondent refers to Miller's "testimony recounting the details

of Washington's brutal sexual assault."  Answer at 113.  These details were frightening.

In closing argument, the prosecutor repeated Miller's story in graphic detail reminding

the jury of her testimony that Mr. Washington allegedly "held that knife to Miss Miller's

privates. . .beat her in the face . . . threatened to kill her if she testified."  Tellingly, he concluded:

> . . .*you judge whether to believe her or not.*

34 RR 59-60.

Indeed, so powerful was Miller's testimony that the jury sent a note to the court during its

deliberations *specifically requesting to view her testimony.*  34 RR 68.  Two of the jurors,

interviewed some thirteen years after the trial, recalled the testimony in vivid detail.  *See* Exhibit

49 to Petition (Affidavit of Gerald Bierbaum) at paragraphs 10, 12.

In short, the importance of Miller as a witness can not be denied, despite Respondent's

efforts to do so.

### (c)      Independent corroboration.

Respondent argues that Ms. Miller's brutal account was "corroborated, in part, by the fact

that Washington was indicted and later convicted of a lesser included offense" in connection

with the incident.  Answer at 111.  In fact, the charges were reduced to a misdemeanor assault –

hardly corroboration of the incident described by Ms. Miller at trial.  Furthermore, her testimony

was contradicted – not corroborated – by a number of other pieces of objective evidence, *e.g.*,

she testified that a man with Mr. Washington at the time, Albert Brooks, was "pleading" with

Mr. Washington to stop, 32 RR 170-171,  yet she told the police Mr. Brooks had raped her (*see*

Exhibit 52 to Petition, Houston Police Department report of assault); she gave conflicting

accounts of the incident when she reported it several days afterwards.  Exhibit 50.

### (d)  More significant alleged violent acts.

Respondent asserts that Ms. Miller's testimony was not material because "the state's case

rested on the significant number of violent incidents and other crimes attributable to

Washington."  Answer at 108.  After claiming that "the record is replete with evidence

demonstrating Washington's disposition towards crime and violence," Respondent rattles off a

history that is long but not all that weighty.

Remarkably, the State has made much of the fact that Mr. Washington at the age of 14,

broke into a neighborhood community center "in an attempt to steal food from the kitchen."

Answer at 109.  32 RR 145-150.

One certainly marvels at the logic whereby a prior *murder* by a key witness can not be

used merely for *impeachment* at a penalty phase where the defendant's life is at stake because it

is too remote in time, but an equally remote attempt by the defendant to steal *food* when he was a

*child* is perfectly admissible to prove the defendant should be executed.  Similarly, Respondent

would have the Court put on the "execution" side of the scale the fact that Mr. Washington,

80

again, as a young teenager, walked off from an unsecure juvenile facility for *thirty minutes*.  *See* further discussion *infra* in section (4).

As further evidence of Mr. Washington's dangerousness, and worthiness of execution, Respondent notes that "while under arrest for stealing property from his brother, the police found marijuana in Washington's shirt pocket." Answer at 109.  Again, the hypocrisy is overwhelming. The Respondent simultaneously contends that prosecution witness Linda Desso's convictions for marijuana should not be admissible for impeachment purposes.  Answer at 117-118.  *See* further discussion *infra* at section (2).

The rest of the "dangerousness" case consisted mostly of a shoving match with a fellow jail inmate, "cursing" at a deputy, and an occasional verbal threat – not the kind of thing that should result in execution.

Nevertheless, Respondent contends that "the overwhelming strength of this evidence contradicts Washington's assertion that Miller and Desso were the State's star witnesses during the punishment phase."  Answer at 110.  This assertion begs the question, "if they were not the star witnesses, who was?"

### (e)     Miller's credibility was otherwise "questionable."

Respondent makes the anomalous argument that because Miller was "a witness whose credibility ha[d] already been shown to be questionable," Answer at 113, any evidence of her criminality – specifically, multiple theft convictions and the murder of a 5-year old girl, was immaterial.  Answer at 113.  This is, frankly, preposterous.

### (f)     The state court fact findings are unsupportable.

Mr. Washington's jury did not know *anything* about Ms. Miller's criminal background.

81

To the jury, she was just a good, upstanding, law-abiding member of the community.  Sure, she

was impeached on a few things in her testimony, but it is nothing short of astounding that the

state courts could find:

18.      . . . that Miller was twenty-four years old in 1961 when she received a five-year
        sentence for murder without malice for causing the death of a child by shooting a
        handgun at a residence after an argument. . . .

25.      . . . that the probative value of Miller's 1961 conviction does not substantially
        outweigh its prejudicial effect . . .

26.      . . . .Miller's 1961 prior conviction for murder without malice would not have put
        the applicant's case in a different light . . .

27.      . . . .Miller's 1983 and 1984 misdemeanor theft convictions would not have put
        the applicant's case in a different light . . .

28.      . . . . Miller's 1961 conviction for murder . . .and Miller's 1983 and 1984
        misdemeanor theft convictions constitute minimal impeachment value, if any . . .

It is respectfully urged that the state court findings are "an unreasonable determination of

the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254

(d)(2).  Accordingly, the Court must vacate Mr. Washington's death sentence.

   **2.    Linda Desso.**

       **(a)    The paramount importance of Desso's testimony.**

   The testimony of Linda Desso and Ella Miller, was the crux of the State's punishment

case against Petitioner.  Ms. Desso testified about an alleged assault committed against her by

Mr. Washington.  Ms. Desso claimed that Mr. Washington hit her in the head with a shotgun and

fired a shot between her feet during a botched drug deal.  32 RR 240-248.  Obviously, Desso's

testimony was far more significant in the jury's "future dangerous" assessment than testimony

about Mr. Washington stealing food when he was 14 years old, getting in a shoving match with a

82

fellow inmate "over use of the telephone," or cursing at a deputy who "wanted to take his shoes away from him."  Answer at 109-110.

As with the testimony of Ms. Miller, *supra,* Respondent asserts that Ms. Desso's testimony was "not paramount to the State's case on punishment."  Answer at 108.   Rather, "the strength of the State's case rested on the significant number of violent incidents and other crimes attributed to Mr. Washington."  *Id.*   It is understandable that Respondent would downplay the importance of Ms. Desso's testimony for purposes of the *Brady* materiality test, given that the State violated Mr. Washington's fair trial rights by withholding Desso's extensive criminal record.

On cross-examination, Ms. Desso was asked whether she had ever been convicted of possession of marijuana, to which she responded "not to my knowledge." 32 RR 252.  In fact, she had *three convictions* for possession of marijuana.  *See* Exhibit 73 (Harris County criminal history report of Linda Desso).  In addition, she had *six convictions* for prostitution, one conviction for theft and three convictions for unlawful carrying of a weapon.  All of this information was known to the State and withheld from Mr. Washington.  *See* Petition at 230-234.

In short, not only did the State unlawfully withhold Desso's extensive record, they allowed her to lie about it to Mr. Washington's jury.  The Respondent asks this Court to believe that "in light of her extensive criminal history, it is not without possibility that Desso truly had no recollection of being convicted of possession of marijuana."  Answer at 118.  Mr. Washington asks this Court to vacate his death sentence because it was accomplished through deceit and misconduct.

**(b)      Independent corroboration.**

No charges were ever filed as a result of the alleged assault on Ms. Desso by Mr.

Washington, so the State presented an individual named Ben Linton to attempt to corroborate her

story.  As Respondent recounts Linton's testimony, he described "a very similar sequence of

events," Answer at 112, but for one crucial detail: Linton admitted he did not "get a good look"

at the man.  *Id.*  Thus, he was able to corroborate a similar incident, but he was not able to

identify Mr. Washington as the perpetrator.  Given Desso's six prostitution convictions, three

marijuana convictions, three illegal weapons convictions, etc., it is highly likely that the "very

similar sequence of events" described at trial by Linton may not have involved Mr. Washington

at all.  Given Linton's inability to tie Mr. Washington to the incident in question, his testimony

hardly qualifies as "corroboration."

**(c)      Desso's credibility was otherwise "questionable."**

Here, again, Respondent contends that the failure to disclose Desso's criminal

background and allowing her to lie about it did not ultimately matter because there was

"adequate impeachment" of her "notwithstanding the absence of any reference to [her] prior

criminal convictions." Answer at 114.  Specifically, Respondent suggests that further

impeachment based on more than a dozen undisclosed convictions was unnecessary since the

jury knew she "used several different aliases . . . lived in a hotel frequented by prostitutes, that

she was arrested for unlawfully possessing a pistol, and that she smoked and purchased

marijuana." *Id.*

Clearly, evidence of her many convictions for prostitution, drugs, illegal weapons and

theft would have further damaged her credibility and caused the jury to question the account of

84

her alleged assault by Mr. Washington.

> **(d)     The state court fact findings are unsupportable.**

The state court fact findings concerning the State's withholding of Desso's criminal record and allowing her to testify falsely, written by Respondent and rubber stamped by the courts, are unreasonable and should be rejected by this Court, e.g.:

> 53.     The Court finds . . .  That "to her knowledge" she had not been convicted of possession of marijuana, but she did not remember . . .

> 54.     . . . .no testimony was elicited as to whether Desso had been convicted of prostitution; that Desso was never asked whether she was a prostitute . . .

> 58.     . . . . evidence of Desso's prior prostitution convictions would not have placed the applicant's case in a different light . . .

Mr. Washington had a constitutional right to know about the criminal records of key state witnesses Miller and Desso.  Had the jury known they were both career criminals, constantly in and out of trouble with the law, with abundant reasons to curry favor with the District Attorney's Office, the jury might well have doubted the reliability of their damaging and highly prejudicial testimony.  The result of all this chicanery is that Mr. Washington's fair trial rights were trampled and the reliability of his death sentence is greatly undermined.  Relief is therefore required.

> **3.     Oliver Palmer.**

The same is true of Oliver Palmer, a fellow jail inmate who provided highly prejudicial testimony about alleged statements made by Mr. Washington in jail.  As described in the Petition at 234-236, although he denied any deals under oath, Palmer seems to have been rewarded for his testimony with leniency, based on notations from Mr. Washington's prosecutor in Palmer's

case file and statements from other inmates to whom Palmer admitted receiving favors.  The state courts determined that Petitioner failed to show "that the State offered or promised Oliver Palmer anything in exchange for his testimony" and found that evidence that he had admitted a deal to other inmates was "hearsay" and "not dispositive to any habeas allegation."

Such issues are appropriately resolved in an evidentiary hearing which has never been afforded to Mr. Washington.  He respectfully requests the opportunity to prove his allegations in this Court.

**4.    Alan Belcher.**

An evidentiary hearing is also the appropriate means for resolving the factual dispute concerning Mr. Belcher's testimony concerning Mr. Washington's short disappearance from a juvenile facility when he was fifteen years old.  Contrary to Belcher's testimony that Mr. Washington was missing for "several hours," the District Attorney's case file indicates it was only for thirty minutes – hardly the "escape" depicted at the punishment phase.  For obvious reasons, the notion of "escape" would have grave implications to a jury deliberating whether to impose a life sentence.  Mr. Washington was certainly prejudiced by this grossly hyperbolic characterization of a short "walk-off" from an unsecure juvenile facility.

**CONCLUSION**

For the foregoing reasons, the Petitioner respectfully requests that the Court:

1.    Issue a writ of habeas corpus that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death;

2.    Grant him further discovery and an evidentiary hearing at which he may present

evidence in support of these claims, and allow him a reasonable period of time subsequent to any such hearing in which to brief the issues of fact and of law raised by this petition or such hearing;

3.    Direct that under Habeas Corpus Rule 7 the record in this case be expanded to include the "additional materials relevant to the determination of the merits of the petition" which are found in the volume of exhibits filed with this Petition.

4.    Grant such other relief as law and justice require.

Respectfully submitted,

s/ James C. Lohman

_____

James C. Lohman
1806 East 39th Street
Austin, Texas 78722
(512) 542-9947
Southern District of Texas Bar #  764049
Florida Bar # 570214

David Lane
Killmer, Lane & Newman, LLP
The Oddfellows Hall
1543 Champa Street, Suite 400
Denver, Colorado 80202
(303) 571-1000
Colorado Bar #  16422
*Pro Hac Vice*

COUNSEL FOR MR. WASHINGTON

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing Petitioner's Reply to Respondent Quarterman's Answer to Third Amended Petition and Motion for Summary Judgment was served by this Court's electronic filing system to Tina J. Miranda, Office of the Attorney General, P.O. Box 12548, Capitol Station, Austin, Texas 78711, this __2__ day of February, 2009.

s/ David A. Lane

_____

Attorney