United States District Court
Southern District of Texas
**ENTERED**
March 30, 2026
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WILLIE TERION WASHINGTON, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | H-07-CV-0721 |
| | § | |
| ERIC GUERRERO, | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER

The petitioner, Willie Terion Washington, was convicted of murder and sentenced to death for a murder committed during the course of a robbery. The underlying crime is not at issue here.

The Fifth Circuit remanded this case for an evidentiary hearing on two claims of ineffective assistance of counsel. The Fifth Circuit found that a hearing was required under *Martinez v. Ryan*, 566 U.S. 1 (2012). In *Martinez*, the Supreme Court carved out a narrow equitable exception to the rule that a federal habeas court cannot consider a procedurally defaulted claim of ineffective assistance of counsel.

> [W]hen a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding, a prisoner may establish cause for a default of an ineffective-assistance claim . . . where appointed counsel in the initial-review collateral proceeding . . . was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668 . . . (1984). To overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.

*Id.* at 14.

After the remand, but before this Court was able to conduct a hearing, the Supreme Court

issued its decision in *Shinn v. Martinez Ramirez*, 596 U.S. 366 (2022).   In *Martinez Ramirez*, the Court held that lower courts interpreted the *Martinez* exception too broadly, and that an evidentiary hearing is not appropriate on a defaulted claim if the petitioner failed to develop the factual record for his claim in state court.   In other words, a *Martinez* hearing is permitted only when the petitioner satisfies the stringent requirements of 28 U.S.C. § 2254(e)(2), requiring the petitioner to develop the factual record in state court, unless the claim relies on a new rule of constitutional law, or on a factual predicate that could not have been discovered through the exercise of due diligence. The parties briefed the issue, and this Court conducted an evidentiary hearing   but cautioned that "[w]hether the Court can ultimately reach the merits of [Washington's] claims will depend on Washington making a threshold showing that he can avoid the procedural default of the claims . . .."   *See* Docket # 265 at 4.

## I.       **Relevant Background**

Washington was represented in his state habeas proceedings by Gary Reger, a transactional and bankruptcy attorney at a firm in Beaumont.   He had never handled a criminal case before, and Washington's habeas proceeding would be his only death penalty case.   2 P at 5-7.[1]

Washington sets out in detail the crisis in capital representation facing Texas in 1990. For the sake of brevity, it is sufficient to state that the decision whether to appoint counsel in capital habeas cases was left to the discretion of individual state judges, and funding for capital habeas cases came from Texas counties.   At the time, Texas had the most populous death row in the country.   Because of this *ad hoc*, and often insufficient, method of funding capital habeas representation, qualified attorneys were hesitant to take on such cases.   *See, e.g., McFarland v.*

---

1 Citations to the hearing record will be to the day and morning or afternoon session of the transcript.   For example, "2P" refers to the transcript of the PM session of the second day of the hearing.

*Scott*, 512 U.S. 1256, 1261-62 (1994) (Blackmun, J., dissenting).

In 1988, the Texas Resource Center ("TRC") was created to help alleviate the problem. The TRC employed approximately 15 attorneys who would recruit, train, and assist volunteer *pro bono* attorneys in capital habeas cases.   A report commissioned by the Texas State Bar in 1993 found that the TRC was not equipped to handle the volume of capital cases in Texas at the time.   *See* The Spangenberg Group, A Study of Representation in Capital Cases in Texas (Mar. 1993).

Against this backdrop, Gary Reger saw a post in the state Bar Journal seeking volunteer lawyers to take capital habeas cases on a *pro bono* basis.   2P at 8; Petitioner's Exhibit ("PEX") 325.003.   Reger practiced general commercial law with an emphasis on banking and bankruptcy.   2P at 22.   He had never tried a case and had no experience in criminal law beyond a law school class.   2P at 7, 22.

Reger contacted the TRC and learned that Washington was one of 15 death row inmates in need of habeas counsel.   Reger planned to meet with Washington before accepting the case but learned that the trial court planned to set an execution date before he could do so.   2P at 29; PEX 325.002, .003.   "On the basis that Mr. Washington was facing an emergency situation, I agreed to represent him."   PEX 325.003.   The TRC provided Reger with the trial record, a general information memorandum, an ABA Manual, and several sample habeas petitions.   TRC informed the State and the trial court that Reger agreed to represent Washington, and the trial court agreed to postpone setting an execution date to give Reger 30 days to review the record and report back to the trial court.   PEX at 325.

Reger contacted Washington's trial counsel, Reo Harris, and obtained his file.   The file consisted of 56 sheets of paper.   Reger testified that the file consisted mostly of notes Harris

made during *voir dire* and trial; there was nothing to indicate that Harris did any preparation or investigation before trial. 2P at 35.   In reviewing the file, Reger identified as possible issues trial counsel's failure to present mitigating evidence during the punishment phase, and the use of race-based peremptory juror strikes by the prosecution.    PEX 296; ECF 271, Exh. 1.

Reger filed his first motion for discovery and expert assistance the day before he was due to report back to the trial court.   ECF 271, Exh. 1.   The motion noted the State's refusal to produce its file and his belief that the case had a potential *Batson* issue.   He also identified a possible ineffective assistance of counsel claim and requested leave to depose trial counsel.   2P at 45-46; ECF 271 at Exhs. 1, 2. Reger also acknowledged his lack of relevant experience and asked the court to appoint a more qualified attorney to replace him.      The trial court denied the requests.

In December 1989, Reger paid $500.00 out of his own pocket for a private investigator to help him develop the ineffective assistance of counsel claim.   DEX 52, 2P at 51.   He also sent Washington a questionnaire about his background.   DEX 6.004; DEX 44.

Reger filed an initial habeas petition that included a claim that trial counsel was ineffective at the punishment phase.   This claim was supported only by Washington's completed questionnaire.   Reger also included a footnote "reserving" a claim that the prosecution used race-based juror strikes. Reger requested an evidentiary hearing to further develop the record.   2P at 70.   Throughout the course of Washington's state habeas proceedings, Reger would file additional motions to depose trial counsel and the trial prosecutors and requesting the assistance of an expert in criminal defense to help identify issues, a private investigator, forensic experts, and again asking to be replaced with a more qualified attorney. *See* ECF 271, Exh. 5 and 6; 2P at 53-55.   He also re-urged his request for an evidentiary

hearing.   ECF 271, Exh. 4.   He filed another motion a few months later re-urging his discovery requests and requesting several additional depositions.   *Id.* at Exh. 7.   Some four years later, the trial court denied the motion for a hearing.   Reger re-urged his discovery motions regarding possible ineffective assistance claims the following year.   ECF 271, Exh. 11.

The trial court signed the State's proposed findings of fact and conclusions of law and recommended denying the petition.   The Texas Court of Criminal Appeals adopted the findings and conclusions and denied relief.   *Ex Parte Washington*, 2007 WL 602813 (Tex. Crim. App. 2007).

On March 17, 1998, Washington filed a motion for appointment of new counsel to represent him in his federal habeas proceeding.   *Washington v. Cockrell*, No. 4:99-cv-140. New counsel was appointed to represent him.   On January 14, 1999, he filed his initial federal habeas petition raising, among other claims, the *Batson* and ineffective punishment phase assistance claims at issue here.   He amended his petition on February 25, 1999.

In May 1999, Washington filed a motion for discovery requesting access to the State's file, among other discovery.   The Court granted the motion in part and ordered the State to produce its files on the case.   *Washington*, at Docket Entry No. 64.   While inspecting the Harris County District Attorney's file, Washington discovered racially coded juror questionnaires.   The prosecution marked the questionnaires on Black potential jurors with a "B."

Following this discovery, Washington filed a second amended petition.   On December 10, 2001, the Court dismissed the second amended petition without prejudice to allow Washington to return to state court and exhaust claims based on newly discovered evidence.   *Id.* at Docket Entry No. 97.   Washington filed a successive state habeas application raising several

claims, including the two currently at issue. The CCA dismissed them as procedurally defaulted on the grounds that Reger could have raised them in Washington's first state habeas application. *Ex Parte Washington*, Nos. WR-35,410-02 and 03, 2007 WL 602813, at *1 (Tex. Crim. App. 2007).

Washington returned to federal court and sought new counsel, as his original federal counsel had moved to another job. The Court appointed James C, Lohman and David Arthur Lane to represent Washington and gave them until September 1, 2008, to file a new amended petition.

On August 3, 2009, the Court denied Washington's petition, finding that both claims now at issue were procedurally defaulted. The Court granted a certificate of appealability ("COA") on the *Batson* claim. Washington moved for a COA on two other claims. The Fifth Circuit affirmed the dismissal.

On March 20, 2012, the Supreme Court *Martinez v. Ryan*, 566 U.S. 1 (2012), creating an equitable exception to the procedural default rule. In *Martinez*, the Supreme Court held that the procedural default of a viable ineffective assistance of trial counsel claim could be excused if that default resulted from ineffective assistance of counsel in the first post-conviction proceeding in which the underlying claim could be raised. In *Trevino v. Thaler*, 569 U.S. 413 (2013), the Court clarified that *Martinez* applied to Texas state habeas proceedings.

On June 11, 2012, Washington filed a petition for a writ of *certiorari*, arguing that *Martinez* excused his procedural default and allowed a federal habeas court to reach the merits of his defaulted claims. On June 3, 2013, the Supreme Court granted Washington's petition for *certiorari* and remanded the case for further consideration in light of *Trevino*. *Washington v. Thaler*, 569 U.S. 1014 (2013). On January 3, 2014, the Fifth Circuit granted a COA and

remanded the case to this Court for reconsideration of the procedurally defaulted ineffective assistance of counsel claims.   *Washington v. Thaler*, 551 F. App'x122 (5th Cir. 2014).

On remand, the Court again rejected the claims, distinguishing the facts in Washington's case from those in *Martinez*.   On July 18, 2017, the Court denied Washington's motion to alter or amend the judgment.   Washington appealed, and the Fifth Circuit granted a COA, vacated the denial of relief, and remanded the case for an evidentiary hearing on the *Batson* and ineffective mitigation claims.   This Court conducted a 5-day evidentiary hearing in which it heard testimony from a number of witnesses.

## II.      Analysis

There is no dispute that Washington's Ineffective Assistance *Batson* and Mitigation claims are procedurally defaulted.   Therefore, Washington must clear two procedural hurdles before this Court can consider the merits of his claims.   First, he must demonstrate that the procedural default is the result of ineffective assistance of his state habeas counsel.   Second, because his claims for relief depend on evidence not presented in his state habeas proceedings, he must show that this Court can consider his new evidence under 28 U.S.C. § 2254(e)(2).

### A.      Section 2254(e)(2)

*Martinez Ramirez* makes clear that even if habeas counsel was ineffective, thereby providing cause for the procedural default of Washington's claims under *Martinez*, this Court cannot consider any new evidence if Washington failed to develop the factual record in state court.   The operative question, therefore, is whether Washington, through habeas counsel, failed to develop the record in state court.

> To say a person has failed in a duty implies he did not take the necessary steps to fulfill it. He is, as a consequence, at fault and bears responsibility for the failure. In this sense, a person is not at fault when his diligent efforts to perform an act are thwarted, for

example, by the conduct of another or by happenstance.

*Williams v. Taylor*, 529 U.S. 420, 432 (2000).   "Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court . . .."   *Id.* at 435.

The record in this case establishes that Washington's state habeas counsel requested discovery and expert assistance on multiple occasions, including requests for documents, depositions, and an evidentiary hearing.   He specifically identifying *Batson* and ineffective punishment phase assistance of counsel as possible issues.   His requests were all opposed by the State and denied by the state habeas court.

The Respondent now argues that Washington was not specific enough in identifying issues and that he could have done more to obtain discovery.   The specificity argument is unavailing because it relies on a Catch-22:   The petitioner must be very specific in identifying the issues on which he seeks discovery, but he lacks specifics because he has not had discovery. The second simply goes beyond the requirement of diligence. The Fifth Circuit has found the diligence requirement satisfied when state habeas counsel requested an evidentiary hearing and depositions but was denied by the state habeas court.   *See Adams v. Quarterman*, 324 Fed. App'x 340, 346-47 (5th Cir. 2009).   Reger was clearly diligent in his efforts to develop the factual record and Washington's new evidence is not barred by 28 U.S.C. § 2254(e)(2).

### B.   Ineffective Assistance of State Habeas Counsel

The standard for ineffective assistance of counsel is set out in *Strickland v. Washington*, 466 U.S. 668, 687 (1984).   In order demonstrate ineffective assistance, Washington must show that counsel's representation fell below an objective standard of reasonableness.   *Id.* at 687-88. Reasonableness is measured against prevailing professional norms and must be viewed under the

totality of the circumstances.   *Id.* at 688.   In assessing prejudice, "*Strickland* asks whether it is reasonably likely the result would have been different," if not for counsel's deficient performance.   *Harrington v. Richter*, 562 U.S. 86, 111 (2011)(internal quotation marks omitted). In the context of ineffective assistance of state habeas counsel as cause to excuse the default of an ineffective assistance of trial counsel claim, the petitioner satisfies the prejudice requirement if he shows "that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit."   *Martinez v. Ryan*, 566 U.S. 1, 14 (2012).

The record in this case establishes that, while Mr. Reger recognized that Washington's trial contained possible *Batson* and ineffective punishment phase assistance claims and he sought to develop them, he ultimately failed to present them in the state habeas petition thereby defaulting them.   That constituted deficient performance on his part.   The Court recognizes the difficult position in which Mr. Reger found himself and appreciates his noble effort to fill a gaping hole in Texas's system of indigent legal representation, but that does not change the fact that reasonably competent capital habeas counsel would have raised these claims in the state habeas petition.   Even if the claims were factually underdeveloped due to the lack of discovery, competent habeas counsel would have recognized the need to preserve them for federal review. Reger's failure to do so constitutes deficient performance.   As discussed below, the claims are substantial.

### C.   *Batson*

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment prohibits prosecutors from striking potential jurors solely based on the juror's race.   A successful *Batson* challenge comprises three steps:

> First, the defendant must make a prima facie showing that the prosecutor's use of peremptory challenges excluded members of a certain race from serving on the jury. Second, once the defendant makes that prima facie showing, the burden shifts to the state to provide a neutral explanation for the strikes related to the particular case being tried. Once the state offers an explanation for its challenges, the trial court must determine whether the defendant has established purposeful discrimination in the jury selection process. The ultimate burden of persuasion stays with the defendant throughout.

*Puckett v. Epps,* 641 F.3d 657, 663 (5th Cir.2011) (internal citations omitted).

Washington's trial counsel, Reo Harris, testified at the evidentiary hearing in this case that racial discrimination in jury selection was a frequent practice in Harris County at the time of Washington's trial.  2A at 64.  Both trial prosecutors in Washington's case also had a documented history of using race-based peremptory challenges.  *See*, *e.g.*, *Rosales v. Quarterman*, 2008 WL 11492954 (S.D. Tex. 2008)(finding that Harris County prosecutors in general, and Washington's prosecutor Keno Henderson in particular, "rarely, if ever, allowed minorities to sit on capital juries"); *Whitsey v. State*, 796 S.W.2d 707 (Tex. Crim. App. 1989)(prosecutor Robert Stabe violated *Batson*).  In both *Rosales* and *Whitsey*, as in Washington's trial, the prosecutors used over half of their peremptory challenges to remove Black jurors from the panel and made notations of the juror's race on juror questionnaires. In both cases, courts found the prosecutors' race-neutral explanations to be pretextual.

The record shows that the prosecution in this case accepted 6 of the first 8 White jurors it questioned, while striking each of the first 5 Black and Hispanic jurors questioned.   *See* Chart at pages 49-51 of Petitioner's post-hearing brief (Docket No. 331) and record citations therein. Washington points out that the prosecutors used 75% of their peremptory strikes to remove 43% of the minority jurors in the pool, while using only 25% of their peremptory strikes to remove

only 6% of the White jurors.

On cross examination during the evidentiary hearing, trial counsel Reo Harris testified that he deliberately passed up on a *Batson* objection so that he could swap strikes with the prosecutors.   This testimony contradicts his earlier testimony in which he indicated that he did not see a *Batson* violation, and other testimony suggesting that he did not understand *Batson*, thinking that he could only object if the prosecutor acknowledged striking a juror because of race.   *See, e.g.*, 2A at 64, 69-71.   The record establishes that Harris did not understand *Batson*, the factual basis for a *Batson* objection was clearly present, and trial counsel rendered deficient performance by failing to raise it.

The Fifth Circuit appears to have adopted the view that, to demonstrate prejudice in a *Batson* ineffective assistance of counsel claim, the petitioner must show that a *Batson* violation occurred.   "Without showing a violation . . . [the petitioner] has failed to show that her attorney's representation was prejudicial when he did not object to the State's use of its peremptory strikes." *Hebert v. Rogers*, 890 F.3d 213, 224 (5th Cir. 2018)(rejecting a claim of ineffective assistance of counsel for failure to object to allegedly improper peremptory strikes based on gender).

The record shows that the State accepted 20 out of 53 White prospective jurors, but only one out of 14 minority prospective jurors.   Minority jurors made up 22% of the venire, but the State used well over half of its peremptory strikes on minorities and wound up with only a single minority juror on the panel that convicted Washington.   *See* Chart on page 76 of Petitioner's Post-Hearing Brief.

While the prosecutors offered race-neutral explanations for their strikes at the evidentiary hearing, those explanations are not credible.   Not only was the testimony filtered through the

lens of almost four decades of post-*Batson* experience, but Stabe acknowledged that, in preparing for the hearing, he "asked the Attorney General's Office if they had any suggestions" for what he should say.   1A at 32.   Moreover, some of the race-neutral explanations offered by the prosecutors are not borne out by the record.   For example, they claimed that they struck venire member Hernandez because he stated he would require more than proof beyond a reasonable doubt.   In fact, he testified that he had no problem with the reasonable doubt standard.   5 Tr. at 596-97.   While other minority venire members expressed confusion at the standard of proof, they stated that they could apply the proper standard after it was explained to them.   *See*, *e.g.*, 2 Tr. at 137-41.   The prosecution did not strike White venire members who expressed similar confusion or difficulty with the burden of proof.   *See*, *e.g.*, 5 Tr. at 486, 528; 18 Tr. at 2181.   Similarly, Henderson claimed that the fact that a venire member had not previously thought about the death penalty was a race-neutral basis for some strikes, 1P at 8-9, 22, but this factor was not applied consistently to White and minority jurors.   *See*, *e.g.*, 5 Tr. at 499; 14 Tr. at 1700 (White venire members who were accepted by the State stating that they had not thought about the death penalty).   The same disparity is true for venire members who said that they did not always believe in the death penalty.   *Compare* 1 P at 8, 10-11 (justification for striking minority jurors) and 10 Tr. at 1242; 18 Tr. at 2152-53 (similar answers by White jurors who were accepted by the State).   The prosecutors also struck two minority jurors who stated that they would require the testimony of more than one witness before voting to convict, even though they later said that they could convict on the testimony of one witness and the prosecution accepted a White juror who made substantially similar statements.   *Compare* 1A at 53-54 and 1P at 22 *with* 13 Tr. at 1619-20; 19 Tr. at 2298-2300.   The same is true for White versus minority jurors who stated that they would interpret the death penalty special issue of a

"probability" that the defendant would pose a future danger as closer to a certainty, c*ompare* 1A at 44, 53, 55; 1P at 34-35 *with* 17 Tr. at 2088; 22 Tr. at 2677, their ability to answer "yes" to the future dangerousness question based solely on the facts of the underlying crime, *compare* 13 Tr. at 1629-30; 15 Tr. at 1841-42 *with* 10 Tr. at 1255-56; 15 Tr. at 1864-65, their Catholic faith, *compare* 1A at 54; 1P at 20, 22, 32; 13 Tr. 1612-16 *with* Petitioner's Exhibits 18, 120, 121, 151.

Washington cites numerous other examples of purportedly race-neutral reasons for striking minority jurors being applied in a disparate manner to White jurors. It is not necessary to list all of them in detail here because the examples cited above clearly demonstrate the pretextual nature of the prosecutors' race-neutral explanations.

It is clear that the prosecutors struck prospective jurors because of their race or ethnicity. As such, it is equally clear that Washington raises a substantial *Batson* claim. Therefore, the deficient performance by state habeas counsel constitutes ineffective assistance to excuse Washington's procedural default of the ineffective assistance of trial counsel claim regarding *Batson*; Reger's decision not to raise this claim gained nothing for Washington while barring further development or review of the *Batson* claim (under the law at the time). There was therefore no valid strategic basis for failing to raise the claim.

Moreover, because the underlying *Batson* claim is itself meritorious, *i.e.*, Washington makes a *prima facie* case that the State used race and ethnicity as the basis for striking prospective jurors, and the State's race-neutral explanations are clearly pretextual, Washington was prejudiced by trial counsel's failure to raise *Batson* objections. Washington is therefore entitled to relief on his claim that he received constitutionally ineffective assistance of counsel during jury selection based on counsel's failure to challenge the State's use of race-based peremptory strikes.

**D.      Ineffective Assistance of Penalty Phase Counsel**

Washington also argues that his trial counsel was ineffective by failing to investigate and present mitigating evidence during the penalty phase of his trial.   The general standard for ineffective assistance of counsel is set out above.   In the context of a capital sentencing proceeding, counsel have a duty to investigate the defendant's background.   Any decision to limit investigation must be based on reasonable professional judgment under all the circumstances.   *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003)(citing *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984)).

The record shows that Washington's trial counsel, Reo Harris, spent only 17 hours preparing for Washington's trial.   2A at 52.   Virtually all that time was devoted to preparing for the guilt-innocence phase.   *Id.* at 42.   Harris testified that he did not recall having a strategy for the penalty phase because the trial "wasn't supposed to get to punishment."   *Id.* at 43. Harris testified that he did not believe evidence of Washington's childhood poverty had any mitigating value, *id.* at 81, and that he heard about but did not investigate evidence that Washington suffered abuse as a child, *id.* at 53-54.   He did not request social services records, *id.*, and did not investigate Washington's time at the Gatesville State School for Boys, a state facility that was shut down due to its brutal conditions, *id.* at 59-60.   Harris did not request Washington's school or medical records, despite knowing that Washington suffered a traumatic head injury just weeks before the murder.   *Id.* at 54, 60-62.

The record makes abundantly clear that Harris performed almost no preparation for the penalty phase of Washington's trial.   This total lack of preparation clearly constitutes deficient performance.   *See Andrus v. Texas*, 590 U.S. 806 (2020)(*per curiam*); *West v. Johnson*, 92 F.3d 1385, 1408-09 (5th Cir. 1996); *Wilson v. Butler*, 825 F.2d 879, 881 (5th Cir. 1987); *Nealy v.*

*Cabana*, 764 F.2d 1163, 1178 (5th Cir. 1985).

In assessing prejudice, the question is "whether it is reasonably likely the result would have been different," if not for counsel's deficient performance. *Harrington v. Richter*, 562 U.S. 86, 111 (2011)(internal quotation marks omitted). In the capital sentencing context, that is a reasonable likelihood that at least one juror would have voted not to impose a death sentence. *Wiggins*, 539 U.S. at 537; *Luna v. Lumpkin*, 832 Fed. App'x 849, 852 (5th Cir. 2020).

At the evidentiary hearing, Washington presented evidence that his parents grew up in extreme poverty in Louisiana and had little education. They moved to Houston when Washington's mother, Pearl, was pregnant with Washington. They and their seven children settled in Houston's Fifth Ward, where the last three of their ten children would be born. 4A at 24-30. Testimony established that the Fifth Ward was, during Washington's childhood, a place of extreme poverty, and violence, where prostitution and substance abuse were common. *See*, *e.g.*, 2A at 17-20, 78, 95-96; 3P at 118-22; 4A at 53-55, 61-63, 71-73; 4P at 18-19.

In addition to the economic and social hardships of the neighborhood where he grew up, Washington was subject to physical and emotional abuse from his parents and brothers. This abuse included being beaten with an electrical cord, being awakened in the middle of the night to do chores, and frequent verbal abuse. 4A at 32. The abuse was so apparent that family and neighbors implored her "to stop beating the kids so badly." *Id.* at 41-42.

Washington's father also beat Washington, sometimes with a bullwhip. *Id.* at 32, 41. He was also verbally abusive to Washington. *Id.* at 43.

Washington's brothers were also violent and abusive to Washington. One of the brothers hit Washington in the head, sending him to the emergency room. 4A at 47. The evidentiary hearing transcript is replete with testimony about the Washington brothers'

reputation for violence and criminality.  *See, e.g.*, 3P at 7-8 113-15; 4A at 45-46, 57-58. Evidence also showed that Washington attended a segregated school where teachers would hit students.   Witnesses testified that Washington, in contrast to his brothers, was not violent or aggressive. 3P at 19, 117.   Washington's expert testified that the privations and abuse Washington suffered cause lifelong cognitive and social impediments.   4A at 38-39, 49-50, 60.

When he was 15 years old, Washington was sent to a State school in Gatesville, Texas administered by the Texas Youth Commission for stealing food from a community center.   *Id.* at 76-77.   The same year, the school was ordered closed by a federal judge due to its inhumane conditions.   5A at 21-22.   Washington was well behaved, and was released after serving only six months.   5A at 24.

Washington presented expert testimony that all the factors above left him traumatized. 1P at 42-45.   He also presented evidence that he was a good father.   3P at 122-23; 4P at 11, 13-15. In addition, Washington presented evidence that he suffered a traumatic head injury several weeks before the murder – an injury that trial counsel knew about because he represented Washington in a workers compensation case arising out of the injury.   Experts testified that Washington was still suffering from the effects of the brain injury at the time of the murder, and suffered from an executive functioning impairment, a learning disability, and attention deficit hyperactivity disorder, and these conditions all were present before the murder.   1P at 46-48, 97, 110-11; 5A at 48-49, 76, 78, 81-82, 96.

Washington convincingly argues that his state habeas counsel failed to present substantial available mitigation evidence in support of his ineffective assistance claim because he mistakenly believed that he was not required to demonstrate prejudice for a punishment phase ineffective assistance claim.

There is no question that Reger was ineffective in presenting this claim in Washington's state habeas petition, and that the claim is substantial. Nor is there any question that trial counsel rendered deficient performance in failing to investigate and develop mitigating evidence or formulate a punishment phase strategy.

The question of *Strickland* prejudice is a closer call. While Washington presents substantial evidence that he suffered a traumatizing childhood and that evidence may have garnered sympathy from the jury, the evidence is also double-edged: a juror may also have concluded that Washington's trauma makes him more likely to commit criminal acts of violence in the future. As such, this Court cannot say that it is reasonably likely that at least one juror would have voted against imposing a death sentence. The Court also finds, however, that this is a debatable conclusion and so, as discussed below, will grant a certificate of appealability on this claim.

### III.    Certificate of Appealability

Washington has not requested a certificate of appealability ("COA"), but this Court may determine whether he is entitled to this relief in light of the foregoing rulings. *See Alexander v. Johnson*, 211 F.3d 895, 898(5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny a COA *sua sponte*. The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued.") A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for a COA until the district court has denied such a request. *See Whitehead v. Johnson*, 157 F.3d 384, 388 (5th Cir. 1988); *see also Hill v. Johnson*, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does.").

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(2); *see also United States v. Kimler*, 150 F.3d 429, 431 (5th Cir. 1998).   A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further."   *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000).   The Supreme Court has stated that

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.   *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

This Court has carefully considered the petition  and concludes that jurists of reason would find it debatable whether Washington is entitled to relief on his ineffective assistance of punishment phase counsel claim.   Therefore, Washington has made a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), on that issue and Washington is entitled to a certificate of appealability.

### IV.    <u>Conclusion and Order</u>

For the reasons stated above, it is **ORDERED** as follows:

1.  The portion of Washington's Third Amended Petition (Docket # 42) that was remanded to this Court is **GRANTED IN PART AND DENIED IN PART**. The petition is granted as to Washington's claim that his trial counsel was ineffective in failing to raise a *Batson* challenge.   The petition is denied as to Washington's claim that he received ineffective assistance of counsel in the punishment phase of his trial.

2.  A certificate of appealability is granted as to Washington's claim that he received ineffective assistance of counsel in the punishment phase of his trial.

3.  The Respondent shall release Washington from custody unless, within 30 days of this Order taking effect, the State of Texas moves to grant Washington a new trial.

4.  The portion of this Order requiring Washington's release from custody is **STAYED** pending the completion of all appeals from this Order, up to and including an appeal to the Supreme Court.

SIGNED at Houston, Texas on March 30, 2026.

_____
GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE